PHIPPS *et al. v.* THE NICANOR, etc.

UNIVERSAL MARINE INS. CO., Limited, *v.* THE NICANOR, etc.

(*Circuit Court, S. D. New York.* December 12, 1890.)

1. SHIPPING—STRANDING—NEGLIGENCE.
    After passing a certain point at night, a vessel tacked, and the master proposed to take a certain course, (north-east,) which if made good, would have carried the vessel clear of obstructions. There was a dense fog around the vessel, and she stranded at midnight. She had been within the clear-weather range of a certain light for two hours, but her navigators had not seen it. She had in fact been making a northerly course, owing to a change in the wind and to the existence of a certain current. The fact that the currents at that region are variable is well known to navigators, and is set forth in ordinary sailing directions. No soundings were taken, though they would have been sufficient to tell the vessel navigators that she was not making her proposed course good, and the importance of taking frequent soundings in those waters is given in ordinary sailing directions. *Held,* that the stranding arose from negligence.

2. SAME—CONTRIBUTION.
    Such negligence would defeat any claim for contribution by the vessel owners on account of such stranding.

3. SAME—GENERAL AVERAGE—VOLUNTARY PAYMENT.
    Where a marine protest, showing the fact that the stranding was caused by negligence, is open to the inspection of underwriters, and there is no misrepresentation or concealment on the part of the ship's owners or agents, payment by the underwriters to the ship's agents, on account of a general average adjustment, is voluntary, and cannot be recovered back.

In Admiralty.

FINDINGS OF FACT.

(1) On various dates, between the 8th and 24th days of June, 1889, Thomas W. Howard & Co., of Montevideo, shipped on board the bark Nicanor, then lying at Montevideo, and bound for New York, 13,000 dry hides, of various sizes, all in good order and condition, to be carried by the Nicanor to New York, and there to be delivered in like good order and condition, unto Messrs. Baring Bros. & Co., or their assigns, and the bark agreed, in consideration of freight stipulated to be paid, to transport the hides to New York, and deliver the same as aforesaid, and to that end issued bills of lading at Montevideo to the shippers of the hides, which bills of lading, in due-course, were indorsed and delivered for value to Enos Wilder, a merchant of New York, who became the owner of the hides, and entitled to delivery thereof at New York.

(2) On the 6th of July the Nicanor sailed from Montevideo, with the hides on board, bound for New York, and about 3 P. M. of September 2d, in fine weather, passed the light-ship at the south end of Five-Fathom bank, off the Delaware capes. The vessel was on her starboard tack, sailing in a north-westerly direction, and passed between the two light-ships on Five-Fathom bank, leaving the lower one three or four miles on her port side, and she continued sailing in that direction until about 7 P. M., when, being within sight of land, she came about and sailed on her port tack, on courses between east and south, according to the wind, until 9 o'clock. A little before 8 P. M. she made the north-east end

light-ship about ahead. At 9 P. M. the bark went again on her starboard tack. the light-ship at the north-east end of Five-Fathom bank then being between a quarter and a half of a mile south-east from her, and she maintained this starboard tack until the stranding hereinafter mentioned. At the time she tacked the master of the Nicanor proposed to make a north-east course, which would not carry him within the range of Ludlam Beach light. No pilot had been spoken, although pilots frequently board vessels to the southward of this place. The course of north-east. which the master proposed to take, was a proper course for sailing vessels bound from the light-ships to New York, and if made good would have carried the vessel clear of all obstructions. The wind was variable between south-east and east, and gave him a speed of about six knots an hour. There was a heavy haze, growing heavier towards the shore. About 11 P. M. the master saw and recognized Ludlam Beach light about abeam, bearing west, or west by north, at an estimated distance of eight miles. He kept it in sight with the aid of his glasses for about 15 minutes, and then lost it. The range of the light is $11\frac{1}{2}$ miles, and when the Nicanor had that light bearing westerly distant 8 miles she was about due north of the light-ship at the north-east end of Five-Fathom bank. This fact was patent, and should have been recognized by the master of the Nicanor. The Nicanor was at that point, within the ordinary range of Absecon light, though it was not visible, which indicated the existence of a heavy haze or fog along the shore. The vessel continued on her starboard tack after losing Ludlam Beach light. At 12 o'clock midnight the weather got thick around the vessel, with a heavy mist, and about an hour later she took the ground on the bar of Great Egg harbor. The point where she grounded was about north of the light-ship on the north-east end of Five-Fathom bank, and was about 6 miles south-westerly from Absecon light. The fog was still dense, and so continued throughout the night. Absecon light has a range of 19 miles, and was not seen by the navigators of the Nicanor at any time prior to the stranding, though she had been within its clear-weather range since about 10 o'clock, and no light had been seen since Ludlam Beach light.

(3) The yards of the Nicanor were not braced sharp, but so that she carried the wind about abeam. From the time of leaving north-east end light-ship the wind had been variable between east and south-east, and at the time and place of the stranding was about east by south. The vessel, from the time of leaving north-east end light-ship, had been in fact making a north course instead of a north-east course, as expected, and this had been due to the fact that the wind hauled somewhat to the northward, and to the existence of a current which set her somewhat on shore. The currents at that section of the New Jersey coast are variable, being governed by the winds, and the current which was running was the result of easterly winds previously prevailing. The fact that the currents are variable is a fact well known to navigators, and is set forth in the ordinary sailing directions for the coast. No soundings were

taken by the Nicanor, though soundings would have been efficient to tell her navigators that she was not making good her expected north-east course, but was rapidly nearing the shore, and the importance of taking soundings regularly and frequently when off this coast in thick weather is set forth in the ordinary sailing directions.

(4) When the Nicanor failed on her starboard tack to make good a course sufficiently east of north to clear the coast she should have gone on port tack, or, if that was not a serviceable one, she should have anchored.

(5) After grounding, the Nicanor endeavored, without success, to work into deep water. In the morning salvors came to her assistance, and a contract was made with them by the master, as follows:

"SOMERS POINT, Sept. 2nd, 1889.

"I hereby agree to employ the Atlantic and Gulf Wrecking Co. to assist my vessel, now in distress, and to leave the matter of compensation for her services to be decided by the New York Board Underwriters, binding myself and owners to abide by said award.

[S'd]        "J. F. WOLFE, Master Bkt. Nicanor.
              "JOHN. TOWNSEND, for Atlantic and Gulf Wrecking Co."

The master did not communicate with the cargo interests, or in any way attempt to bind them by this agreement.

(6) On September 3, 1889, the Nicanor was floated. She then resumed her voyage, and arrived at New York on the 4th. A representative of the wreckers, who had remained on board, left the vessel on her arrival.

(7) On September 5th the vessel was entered at the custom-house, on the 6th a delivery permit was obtained, and on the same day the discharge of the cargo began. No cargo had been damaged. No lien by the salvors was asserted against the cargo, and it was delivered to the respective consignees, and taken away as fast as unladen.

(8) On September 6th a hearing was had before the New York Board of Underwriters to determine the amount of salvage, and the following award was thereupon made:

"51 WALL STREET, NEW YORK, September 6th, 1889.

"By an agreement entered into between J. F. Wolfe, master of the Br. Bk. Nicanor, and John Townsend, for the Atlantic and Gulf Wrecking Co., the question of the amounts to be allowed the said salvors for services and assistance rendered to the Br. Bark Nicanor, stranded on Great Egg Harbor bar, September 1, 2, and 3, 1889, was referred to this board for decision and award. The board held a meeting on the 6th September, 1889, at which the respective parties were represented. After due consideration of the case, it was unanimously resolved ' that the sum of fifteen thousand dollars be awarded to the Atlantic and Gulf Wrecking Company, in full for all services and assistance rendered to the Br. Nicanor while ashore on Great Egg Harbor bar.'

[Signed in duplicate.]          "W. I. COMES, Vice-President."
"Attest:
    "AB. SPENCER, Clerk of the Board, for Secretary."

The members of the board, who fixed the amount of this award, besides the vice-president, were Mr. Moore, of the Atlantic Mutual Insurance Company, who had the largest insurance on cargo, and Mr. Bleecker, president of the New York Mutual Company, which was also an insurer of the cargo of the Nicanor.

(9) Immediately thereupon the master went to Messrs. J. F. Whitney & Co., the agents of the barkentine, and asked them to advance the money for him to pay the award. They agreed to do so, paid the salvors, and took the following receipt:

"NEW YORK, September 6, 1889.

"Received of Messrs. J. F. Whitney & Co. (agents of the Bk. Nicanor) fifteen thousand dollars, in full for all services of every name and nature rendered the said bark while stranded at Great Egg harbor, as per award of the New York Board of Underwriters, this day.

"ATLANTIC & GULF WRECKING CO.
"Per WM. A. M. KEATES."

(10) Meanwhile an average bond, bearing date September 4th, had been prepared, and upon the making of the award, the signatures of the several consignees, or their underwriters, were obtained thereto. No signatures were affixed till the 6th, and all the signatures were not obtained until several days afterwards. The average bond provided that the different consignees, or their underwriters, should pay to "J. F. Whitney & Co., owners, or agents of the owners, of the said vessel," whatever should be shown to be a charge upon said cargo, to be stated by Currey & Whitney, adjusters, according to law.

(11) After the shipment of the hides and wool, and before the stranding of the Nicanor, the libelant, which is a marine insurance company, organized and existing under the laws of Great Britian, made marine insurance in favor of Enos Wilder upon one-half interest of the said hides shipped by Thomas W. Howard & Co.

(12) On September 11th Mr. James Lawson, on behalf of two of the libelants, (the British & Foreign Insurance Company, and the Universal Marine Insurance Company,) apparently unaware that the salvage award had been paid by the ship's agents, called on the average adjusters, and offered to pay part of the award. On being told of the payment of the award, he requested a *pro forma* statement to be made up to show the proportion due from said two companies, and thereafter addressed the following letter to the vessel's agent:

"No. 4 HANOVER STREET, NEW YORK, September 17th, 1889.

"*Messrs. J. F. Whitney & Co., New York*—DEAR SIRS: Nicanor. On the 11th inst. I called upon the adjusters, Messrs. Currey & Whitney, for the purpose of offering on behalf of the 'Universal Marine' and the 'British & Foreign' to send checks for our respective proportions of the salvage award. I was much surprised to learn that you had already settled with the salvors, and paid for our account the amount we owed. We did not authorize you to pay our share of the salvage, which we were ready, at any time, to pay ourselves. I therefore beg to notify you that I am still ready to give my check for my

share of the award, and that I will refuse to recognize any claim for commissions for advancing or collecting the same.

"Yours, very truly, JAMES LAWSON, Atty."

The following was inclosed in the above:

"NEW YORK, Sept. 14, 1889.

"*Messrs. J. F. Whitney & Co., New York*—DEAR SIRS: We confirm our verbal tender made by Mr. Lawson, Wednesday, on behalf of the Universal and British & Foreign, to advance our share of the salvage contribution in case of the Nicanor, and hereby give notice that we shall refuse to recognize any claim for commission for advancing. Yours, truly,

"BRITISH AND FOREIGN MARINE INS. CO., (LD.) New York Branch.

"L. A. WRIGHT, Underwriter."

(13) To which Messrs. Whitney & Co. replied:

"NICANOR.

"NEW YORK, Sept. 18th, 1889.

"*Jas. Lawson, Esq., Atty. Universal Ins. Co.*, 4 *Hanover St., City*—DEAR SIR: Your favor of 17th, inclosing letter of British and Foreign Mar. Ins. Co. of 14th, received, and we note your remarks in regard to Nicanor. Having already advanced to the master the sum required by him to pay the salvage award, we fail to understand why he should surrender the commissions properly due us for so doing. At the time the award was made there was no intimation from any underwriter concerned of a desire to provide funds. Our adjusters have prepared a *pro forma* statement, showing $2,700 as your share of the salvage award, (approximate.) If you elect to pay this amount, it will stop the charge of interest from date of payment; but in accepting it we do so with the express understanding that it is without prejudice to any of our rights in the case.

"Yrs., &c., 　　　　　　　　　　J. F. WHITNEY & CO."

(14) Thereupon the libelant paid by check inclosed in the following letter:

"No. 4 HANOVER STREET, NEW YORK, September 20th, 1889.

"*Messrs. J. F. Whitney & Co., New York*—DEAR SIRS: Nicanor. Your favor of 18th inst. is received, together with a *pro forma* statement from your adjusters. I inclose herewith my check for $2,500, being an approximate proportion of my share of the salvage award. Mr. Wilder informs me that the hides are not worth more than $2.75 in New York; but, as your adjusters valued them for contribution at $3.00 each, I have made my check for the round sum above mentioned, instead of the amount stated by them. I will refuse to recognize any claim on your part for commissions for advancing or collecting $2,500. You were not authorized to pay the amount I owed on account of salvage award.

"Yours, very truly, 　　　　　　　　JAMES LAWSON, Atty."

(15) On or about October 4th the general average adjustment, called "Statement of Salvage Charges," was made up. Besides the salvage award there was included $1,261.24 for ropes and sheaves of the vessel, for her disbursements in procuring the salvors, for protest, survey, and adjusters' fees, and agents' commissions for advancing and collecting, and interest. The contribution thereby required from the interest insured by the libelants was $2,514.50.

(16) The marine protest was at all times prior to the payment open to the inspection of the libelants. It showed that the vessel stranded at 1:30 p. m., on Great Egg Harbor bar; that at 9 p. m. she had tacked to the north-east, the wind hauling to the south-east, the north-east light-ship at Five-Fathom bank bearing south-east about half a mile distant; that at 11 p. m. she made the light on Ludlam beach, bearing west about eight miles distant; and that at midnight the weather was becoming thick, and a heavy mist overspread the sea. So far as the protest indicated no soundings were taken at any time while on this north-east tack.

(17) There was no fraud or misrepresentation or concealment on the part of the ship's master, or of her agents or owners. The payment referred to in the eleventh finding was made to the ship's agents, (who had themselves settled with and paid the salvors,) voluntarily, and without duress or detention of goods, and with means of knowledge of the facts which, it is now insisted, indicate the negligence on the part of the ship was the cause of the stranding.

CONCLUSIONS OF LAW.

(1) The stranding arose from negligence especially from the failure to take regular and frequent soundings.

(2) That the stranding arose from negligence would constitute a full defense to any claim for contribution founded on the stranding.

(3) The payment by the libelants on account of the adjustment was voluntary, and cannot be recovered back.

(4) The libel is dismissed, with costs in both courts.

*Butler, Stillman & Hubbard,* for libelants and appellants.

*Wing, Shoudy & Putnam,* for claimants and appellees.

LACOMBE, Circuit Judge. To all arguments based upon the payment of salvage by cargo owners, in order to obtain free delivery of their goods, the sufficient answer is that libelants made no such payments. The salvors asserted no lien upon the goods; their claim was settled by the ship, whose agents, at the captain's request, paid the salvage award and cleared the goods from any lien for such service. The captain made no attempt to bind the cargo or the owners by his agreement with the salvors. Instantly, upon the fixing of the amount due to them, he procured the funds upon the ship's responsibility from its agents and paid the salvors. So far as the ship was concerned, her whole contract of carriage was fully performed. She delivered the goods to consignees in good order, and free from any lien or incumbrance. It is true that she herself asserted a claim for the proportionate amount of the salvage she had paid, and of certain other expenses connected with the stranding; but there is nothing in the evidence to show that she sought to compel payment of this claim by any duress of goods. To any action upon such claim, whether backed by a general average bond or not, negligence causing the stranding would be a full defense. Nay, more, the ship could not establish such claim upon proof of the bare fact that she

stranded; she would have to show sufficient of the attending circumstances to warrant the inference that she stranded without fault. There is nothing to show any concealment or misrepresentation on the part of the ship, and if the libelants did not have full knowledge of all the facts attending the stranding, they had in the marine protest, and in the excerpt therefrom prefixed to the average bond, sufficient to inform them that the ship went ashore while making her way up the Jersey coast on an inshore tack (when his recorded observations should have shown the master that she was making in towards shore) in thick weather, and without using the lead. The libelants are chargeable not only with what they knew, but with what their available means of knowledge would have disclosed to them. Having paid the ship's claim for contribution, voluntarily, with these facts before them, they cannot now insist that the ship shall repay it to them, upon the theory that when they paid it they were mistaken in supposing that the ship, whose stranding, not being in itself a sea peril, was *prima facie* negligent, could show that she used due diligence and proper skill to avoid the accident, and that it was inevitable.