PITTSBURG & ERIE COAL CO. v. GEORGE URBAN MILLING CO.

SAME v. BUFFALO GRAIN CO.

(Circuit Court of Appeals, Second Circuit. December ·12, 1916.)

No. 32.

1. SHIPPING ⬅200—GENERAL AVERAGE—RIGHT OF STRANDED VESSEL TO CONTRIBUTION.

In a suit to enforce general average, the ship does not establish her claim upon proof of the bare fact that she stranded; but she must show sufficient of the attending circumstances to warrant the inference that she stranded without fault.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 631–634; Dec. Dig. ⬅200.]

2. SHIPPING ⬅200—GENERAL AVERAGE—NEGLIGENT STRANDING.

The stranding of a barge loaded with wheat in Buffalo harbor, when making the turn into Buffalo river, on a shoal plainly marked and known to navigators of the harbor generally, *held* due to the negligence of the master in failing to take into consideration the length and depth of his vessel, the stage of the water, and the current, which precluded the owner from the recovery of contributions in general average from the cargo owners for expense of lightering.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 631–634; Dec. Dig. ⬅200.]

Appeals from the District Court of the United States for the Western District of New York; John R. Hazel, Judge.

Suits in admiralty by the Pittsburg & Erie Coal Company, owner of the steam barge P. D. Armour, against the George Urban Milling Company and against the Buffalo Grain Company. Decrees for libelant, and respondents appeal. Reversed.

For opinion below, see 226 Fed. 332.

The libelant is a corporation existing under the laws of the state of Pennsylvania. Two actions in personam in admiralty were begun by the libelant, owner of the steam barge P. D. Armour; one against the George Urban Company, and one against the Buffalo Grain Company. The steam barge on November 6, 1909, left the port of Superior, Wis., for the port of Buffalo, N. Y., laden with a cargo of about 97,000 bushels of wheat. Of this about 49,000 bushels were consigned to the George Urban Milling Company, and about 48,-000 bushels were consigned to the Buffalo Grain Company. The barge was a wooden steam barge about 300 feet in length and was drawing about 17 feet 8 inches to 17 feet 10 inches on her arrival in the harbor of Buffalo. She arrived at the south entrance to the harbor about 8 a. m. on November 12, 1909, and proceeded inside of the Buffalo breakwater to the north entrance. When making the turn into Buffalo river she grounded on a shoal to the east of the entrance to Reading channel.

After it was found that the steamship could not release herself by use of her own power, and that the water was lowering, and that she was subject

to the danger of being opened by the strain, an attempt was made to release her with the assistance of tugs. This met with failure, and, as the steamship was so strained that she had commenced to leak, it was deemed necessary to lighter, and the services of a lighter and tug were procured, and a quantity of the cargo was removed. The next day another attempt was made to release the boat with the aid of two tugs, but this also was without success, and further lightering was resorted to, and the steamer was finally released and proceeded to a place of safety and discharge.

These two suits are brought upon the theory that the sacrifices, losses, and expenses incurred constitute a general average, to be apportioned to and borne by the vessel, freight, and cargo in the proportion of their value as saved. Except for the necessary differences on account of ownership of the respective parts of the cargo and the amounts claimed, the libels are the same. The answers and interrogations propounded thereto, and the answers of libelant to the interrogations are also alike. The cases were consolidated by consent and tried as one in the court below. That court came to the conclusion that the stranding of the barge was not due to negligence, but was occasioned by an error of judgment.

A decree has been entered against the George Urban Milling Company in the sum of $1,470.88 and against the Buffalo Grain Company in the sum of $1,440.88, and has directed that the respondents pay the costs in equal parts.

Brown, Ely & Richards, of Buffalo, N. Y. (Harvey L. Brown, of Buffalo, N. Y., of counsel), for appellants.

Holding Masten, Duncan & Leckie, of Cleveland, Ohio (Frank S. Masten and Frederick L. Leckie, both of Cleveland, Ohio, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The question presented to this court is whether this steamship was stranded through negligent navigation. If she was, of course, the consignees of the cargo are relieved from contribution and general average, and the decree must be reversed.

[1] In any action to enforce general average the ship does not establish her claim upon proof of the bare fact that she stranded. As this court said in Phipps v. The Nicanor, 44 Fed. 504 (1890):

"She would have to show sufficient of the attending circumstances to warrant the inference that she stranded without fault."

In this case the evidence shows that this vessel stranded on a fine morning, in broad daylight, with no fog, gale, or extraordinary conditions of any kind. The stranding occurred about 9:30 a. m. and the wind was estimated at about 15 miles an hour. The buoys and aids to navigation were all in place and in plain sight. The shoal upon which the vessel grounded was on the northerly side of the channel leading into the Buffalo river, being between what is known as the Reading channel and Buffalo river entrance channel. It was marked on the outer end by a horizontal striped stake, and the Reading channel bank was marked by a red stake, and the southerly bank was marked by a black stake. The shoal was known as "the old dumping ground," and has since been removed. The master in charge of the vessel is charged with knowledge of the location of the shoal and that it was marked by the black buoy. He was bound to know the bottom of the

Buffalo entrance, in so far as that knowledge was revealed by charts and soundings available to men of his grade of license.

The red and black buoy was put where it was for the very purpose of warning navigators against going behind or to the eastward of it. The master disregarded it, and went to the eastward, and in doing so got on the dumping ground, which is just what he might have expected. The libelant has not met the burden which the fact and circumstances of stranding put upon it.

The captain of the steamer had been a licensed officer of steam vessels since 1900, and all his service had been on the Great Lakes. He had, every season since he had been in command, visited the port of Buffalo in the Armour prior to the trip when she went aground. It may be that his somewhat limited experience in command as captain accounts for the trouble into which he got on this occasion. When he reached Buffalo he made the south entrance, as certain improvements were being made at the north entrance, and the Lake Carriers' Association had advised that the south entrance should be used while the improvements were under way. The vessel was proceeding under slow speed of about 3 miles an hour, and the indications on the breakwater showed, as he testified, that "the water was a trifle low"—from 4 to 6 inches below normal. His testimony as to what he did follows:

"We crossed over as usual, the usual distance off the breakwater, and when we neared the north entrance, I started to make the turn, port helm. There is practically a square turn, or a little more. We started to port, and she started coming, and she wasn't coming fast enough to suit me, and I ordered the wheel hard-aport, and they put her hard-aport. She came a little faster for a few minutes and then she stopped or slowed up. I rang her up first—signaled the engineer full speed ahead, and she didn't come. She wasn't coming fast enough to suit, and I backed her, backed her in order to swing her stern to port and straighten her up for the piers; backing did swing her stern to port, as I expected. When I ordered her to back, I ordered the helm amidships. It was put so. I continued backing until she started swinging nicely; the stern started swinging to port and started to come, as I considered fast enough to go ahead. Then I ordered the helm hard-aport, and rang the signal to the engineer, 'Full speed ahead.' I rang up full speed ahead, and she started to come ahead up full speed ahead, and she started to come ahead and started to swing, but didn't swing fast enough. She fetched up, port bow, as far back as a little past amidships; found she was on a shoal and deep water."

The trouble was that the current was stronger than he thought it was. The current set over to the northward and was the cause of the stranding. He testified that he found that the current had more effect on the barge than he figured on or expected. In his protest he stated that the current carried him toward the Reading channel, and before he "could straighten her up she grounded on a shoal to the east of entrance to Reading channel." At the trial the mate testified that "the current was a little stronger than he [the captain] thought it was." Asked as to what occasioned the difficulty he replied: "I was confident it was the current—all the time the current settling her down against the bank." The wheelsman, asked how it happened, answered: "We didn't allow there for the current." There is no doubt that the low water and the current caused the difficulty. But

239 F.—18

the captain should have known the current, and the conditions and the effect of them, and he was bound to exercise the skill and caution required by the circumstances.

An experienced navigator testified that he noticed the vessel coming down inside the breakwater until she got a half length beyond the breakwater before she started to make her turn, and that his attention was especially attracted when her bow got past the end of the breakwater, as he knew she "couldn't make it unless she handled quick," as she "was too far to the northward; the others start to make the turn back further up inside of the wall." He was asked, "When you saw the Armour reach past the end of the breakwater, why did you continue to observe her that day?" He replied, "I expected to see her get on." It was to be expected that a vessel 300 feet long and with a beam of 40 or 42 feet and drawing 17 feet and 8 inches or 17 feet and 10 inches of water, and loaded with 97,000 bushels of wheat, and going from 3 to 4 miles an hour, would be slow in turning. Moreover, the shallower the water, the slower she would be in turning, and the poorer she would steer. If she could not make the turn "unless she handled quick," and it was impossible under the circumstances to "handle quick," the stranding was inevitable.

A witness called by the respondent was asked on cross-examination whether all vessels making this particular turn in the harbor made it alike. He replied in the negative. He was then asked whether each man exercised his own judgment and replied in the affirmative. "Q. He has to exercise his judgment as he comes to it? A. Yes, sir. Q. Sometimes the same vessel don't come in twice alike does it? A. No, sir." No doubt it involved an exercise of judgment to determine how this vessel was to make the turn. It was necessary to consider the length of the boat, her depth, the stage of the water, and the current. But it does not necessarily follow that, because there has been an error of judgment, there was no negligence. An error of judgment may be negligence. In The Eli B. Conine, 233 Fed. 987, 147 C. C. A. 661 (1916) this court said:

"'Lack of care under the circumstances,' which is negligence, is rarely willful or reckless; it is usually error of judgment. But the converse is not true —that every error of judgment is negligence. The error must be measured by the standards of conduct and business knowledge furnished by the evidence and by experience, of which even courts can take cognizance without direct testimony. If the error, viewed from that standpoint, is such as would not have been committed by a reasonable man, reasonably skilled in his occupation, it is negligence."

The error of judgment in the case now under consideration, was one which a master of a vessel, who is required to be an experienced and reasonably skillful navigator, would not have committed. It was therefore negligence.

The decree is reversed, with directions to dismiss the libel.