## THE SANTA ANNA MARIA.

### FORACE *v.* SALINAS.

*(District Court, D. South Carolina. February 27, 1892.)*

GENERAL AVERAGE—JETTISON—EVIDENCE OF EXAGGERATION—STRICT PROOF.
    An Italian bark, through collision, sprung a leak and thereafter jettisoned some of her spare furniture, as well as part of the cargo. On an adjustment in general average a certain sum was charged against the cargo, and the owners thereof objected that the jettison was unnecessary. This suit was brought to recover the amount charged against the cargo in the adjustment. The evidence indicated that there was great exaggeration, both in the alleged condition of the bark after the accident, and in the number and value of the articles jettisoned. *Held,* that libelant must make out his case by a preponderance of credible evidence, and, in view of the impression of exaggeration given by the evidence, such articles as were not clearly proved to have been jettisoned should be excluded from the general average adjustment, the others being allowed.

In Admiralty. Suit to enforce adjustment of general average.

*J. N. Nathan,* for libelant.

*J. P. K. Bryan* and *D. B. Gilliland,* for respondent.

SIMONTON, District Judge. The Santa Anna Maria, an Italian bark, was on her voyage from Girgenti to the port of Charleston. She had a

full cargo of sulphur,—570 tons. When she reached this port the master filed his protest, reporting jettison of part of his cargo, 41.481 tons, and of a chain, cable, anchor, water-casks, sails, awnings, hawsers, lines, and cordage, property of the ship. An adjustment of general average was made by Mr. Johnson, a professional adjuster, based on the statements of the protest and of the log. The net sum charged against cargo under this adjustment is $477.20. The cargo had been delivered under the general average agreement. The owner of the cargo makes no complaint as to the mode of the adjustment. He denies the facts upon which it was based.

The adjustment is not conclusive. The facts are open to inquiry. *The Alpin*, 23 Fed. Rep. 819; *The Niagara*, 21 How. 9. The libelant's testimony is this: The bark left Girgenti, 22d April, 1891. She met no severe weather, and no unusual incident, until the night of 26th of July, 1891. About 11:30 p. m., the night being dark and rainy and the wind fresh, she came into collision with some dark object, unknown, at a point upon her bow just about, perhaps a little below, the water-line. She disengaged herself immediately, and passed on. Her rate of speed was six knots. Very soon the sound of water was heard, entering the ship, but from the thickness of the frame at the bow the exact place of the leak could not be ascertained. It would have been a difficult and tedious task to cut into the frame in order to find the spot. The pumps were manned at once by four men. At 2 p. m., the water still gaining on her, sails were shortened. Two casks of water at the bow, holding three-quarters of a ton, were broken open. The starboard anchor chain, and more chain, with the kedge, were thrown overboard. The water still gaining, a consultation was held, and the conclusion reached to jettison cargo. The bark had four hatchways,—a small one near the bow, another just abaft the foremast, the main and mizzen hatch. They concluded to begin at this second hatch. In order to get at this hatch, it was necessary to remove certain articles—spare sails, awnings, rope, and hawsers—piled up on it. These were all removed, and for the purpose of speedy removal were thrown overboard. When the hatch was cleared, they got at cargo, and threw overboard 15 to 20 tons of sulphur. They then went to the main hatch and threw over the rest,—in all, 41.481 tons. This lightened the ship. The water was gotten under control, the leak ceased, and by 2 p. m. the next day the ship was dry. She came into this port on 31st July. No survey of the vessel for the purpose of ascertaining the nature and extent of the injury to her hull was ever had, nor was she repaired, except by a mate, who was a sort of carpenter; and at what cost does not appear. The hatchway was 4 feet square. In order to get at it, they had to remove, from on top of it, 1 foresail, measuring 220 yards; 2 stay-sails, 200 yards; 1 spanker, 110 yards; 4 awnings, 200 yards each; 1 top-gallant sail, 130 yards; 1 topsail, 160 yards; 2 5-inch hemp hawsers, 120 fathoms each; 1 hemp towline, 7 inches, 100 fathoms. The sulphur lay on the skin of the ship, 1½ feet from the keel. When the pumps were sounded, at first, she had in her 2 feet of water above the skin, which continued to increase

until cargo was jettisoned, about 11 A. M. the next day. This is the ship's statement.

The Italian law requires the master to have, among other things, an inventory of ship's equipment, spare sails, etc., called "*inventario di bordo*." Code Commerce, § 643, subd. 19, p. 202. Without this, general average for such articles cannot be claimed. Lown. Gen. Av. p. 45. The question was asked, whether this ship had such an inventory. As the testimony was all taken through an interpreter, it is impossible to say whether the witness understood the question. He said that the inventory was in the log of the day of the occurrence, and that the master had a list of articles on the ship. At all events, it was not produced. The sulphur was discharged on her arrival in port. It came out in lumps and in powder, as sulphur always does, with no marks of water. Considering this statement, it is impossible to resist the impression that there was great exaggeration, both in the alleged condition of the bark, and in the number and value of the articles jettisoned. The collision, which, it is claimed, threatened immediate disaster, left no marks of injury, either to hull or cargo, which could be discovered on arrival at port. The reckless jettison of articles of great use and value, before touching the cargo, worth very much less; adopting this mode of getting at cargo, although the main hatchway was at once accessible, and the whole hold was without compartments; the enormous amount of sails, awning, hawsers, and rope piled up on the surface of the hatch, only four feet by four; the great disadvantage in getting at the truth, arising from the intervention of an interpreter between seafaring men and the counsel, thus preventing anything resembling searching cross-examination; the failure to produce the *inventario di bordo*,—all of these considerations deepen the impression. It is the duty of the libelant to make out his case by the preponderance of credible evidence. The testimony does not enable the court to reach the conclusion that the articles specified were jettisoned from the hatch next forward of the main hatch, nor can it be ascertained what articles from this hatch really were jettisoned, if indeed any were. All these must be excluded from the general average adjustment. It is not inappropriate to quote here the language of Lowndes on General Average, (4th Ed. § 22, p. 92.)

"Many ships are lumbered with all kinds of useless articles on deck, which increase the risk, and are sure to be thrown overboard on the first approach of danger. To guard against the abuse of this practice the rule in England, as in Germany and most other states, is that jettison of ship's materials off the upper deck is not treated as general average, unless it be of such articles as are necessary for the navigation of the ship, and therefore are carried on deck in conformity with the custom of the trade. Boats, studding-sails and their gear, spare spars, anchors, are examples of articles properly carried on deck. Water-casks, provisions, spare sails, cables, ought not to be. Hawsers, in coasting trades or for short voyages, may properly be on deck, though for a long voyage they should be got below as soon as they are dry."

The other articles jettisoned will be allowed. Let the average adjustment be corrected in accordance with this opinion.