**CIA. ATLANTICA PACIFICA, S. A.,**
**Libelant,**

v.

**HUMBLE OIL & REFINING COMPANY,**
**Respondent.**

**No. 4833.**

United States District Court
D. Maryland.
Aug. 31, 1967.

William A. Grimes and Ober, Williams & Grimes, Baltimore, Md., for libelant.

John H. Skeen, Jr. and Skeen, Wilson & Gilbert, Baltimore, Md., James J. Higgins and Kirlin, Campbell & Keating, New York City, for respondent.

FRANK A. KAUFMAN, District Judge.

Libelant,[1] owner of the M/V CLYDE-WATER, chartered that vessel in June of 1962 under a tanker time charter party to a wholly, or substantially wholly, owned subsidiary of Standard Oil Company of New Jersey. The charter party contained the new Jason Clause pursuant to which cargo owners and consignees are required to contribute in general average

1. Sometimes hereinafter referred to as "the ship."

despite negligence of the ship "for which, or for the consequence of which, the Owner [of the ship] is not responsible, by statute, contract, or otherwise."[2]

2. The charter party contains the following provisions (the new Jason Clause appearing as clause 37):

35. The Charter shall, as far as possible, be governed by the laws of England, except in cases of general average, which shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by these rules, according to the laws and usages at the port of London. If a General Average statement is required, it shall be prepared at such port or place in England as selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer, who shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or owner and/or consignee of cargo if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average settlement is prepared. Should the vessel put into a port of distress or be under average, she is to be consigned to the Owner's Agents, paying them the usual charges and commissions.

\* \* \* \* \*

37. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships had belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contributions of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

38. The Vessel, her Master and Owner shall not, unless otherwise in the Charter expressly provided, be responsible for any loss or damage arising or resulting from: any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding, or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or owner, shipper or consignee of the cargo, their Agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from:—act of God, act of war, perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion. Vessel shall have liberty to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress and to deviate for the purpose of saving life or property, or of landing any ill or injured person on board. This clause is not

In October 1963, a full cargo of petroleum products consigned to respondent [3] (a wholly-owned subsidiary of Standard Oil Company of New Jersey) at Charleston, South Carolina, was loaded aboard the CLYDEWATER at the Caribbean island of Aruba and shipped under a bill of lading which incorporated the new Jason Clause. En route from Aruba to Charleston, the vessel stranded on October 16, 1963 on Silver Bank off the Dominican Republic. Efforts to refloat her were successful. As a result of the stranding and/or refloating the CLYDE-WATER sustained substantial bottom and other damage. The master indicated in what appears to be an entry in the vessel's deck logbook dated October 21, 1963 his intention to notify a declaration of general average upon reaching port. The vessel proceeded to Charleston and upon its arrival on October 24, 1963, the ship's master declared general average. The cargo was discharged and delivered to respondent after respondent executed an agreement dated October 24, 1963.[4]

to be construed as in any way affecting the provisions for cessation of hire as provided in this Charter.

\* \* \* \* \*

46. All Bills of Lading issued hereunder shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated therein, and nothing therein or herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of any Bill of Lading issued hereunder be repugnant to said Act to any extent, such term shall be void to that extent but no further.

3. Sometimes hereinafter referred to as "cargo."

4. The provisions of this agreement are as follows:

WHEREAS, it is alleged that said vessel, laden with cargo sailed from Aruba during October, 1963, for Charleston, S. C. and that in the prosecution of her voyage, suffered a casualty and

WHEREAS, by reason of occurrences on the voyage, certain losses and expenses were, and other losses and expenses may be, incurred, which may constitute a charge by way of general average, or otherwise, upon said vessel, her earnings, and her cargo, or which may apply to and be due from specific interests:

NOW THEREFORE we, the subscribers, being or representing owners, shippers or consignees of such of the cargo of said vessel as is severally described and set opposite our respective signatures thereto, in consideration of the premises and of the delivery of such cargo as may be saved, do hereby, for ourselves and our principals and executors and administrators, severally and respectively, but not jointly, nor one for the other, covenant and agree to and with the owners of said vessel for themselves and for all interests concerned in the venture aforesaid, and one with the other, that so much of the losses and expenses aforesaid as upon an adjustment of the same to be stated by \* \* \* Average Adjusters, according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, or to be due from us, shall be paid by us respectively, according to our ratable proportion thereof, to the owners of said vessel, \* \* \*, in and for settlement in accordance with said statement.

Should the value of the services rendered to said cargo be determined by settlement or arbitration, we do hereby severally covenant and agree to pay each our ratable proportion of any sum thus fixed; and in the event of suit being brought to recover for such services, we do hereby severally covenant and agree to give bond for our respective interests in the same manner as if the salvors had required such bond direct from us before surrendering the cargo, and to pay and satisfy fully our ratable proportion of any final judgment rendered therein.

We do hereby severally authorize and direct our respective insurers and all other persons and corporations, who or which guarantee the payment of any general average and/or salvage and/or special charges and/or any amounts that may become due from us under this agreement, to pay for and in our behalf unto the owners of said vessel, \* \* \*, for the purposes aforesaid,

This agreement—the general average agreement—was executed in Houston, Texas by a vice president of respondent and sent by him to the ship's master in care of Tidewater Commercial Company to Baltimore, Maryland, the CLYDE-WATER's next port of call, under cover of the following letter:

Dear Sir:

We as owners of the cargo aboard the MT "CLYDEWATER" which loaded and sailed on October 15, from Aruba bound for Charleston, S. C., guarantee to pay all proper and legal general average contributions due from the cargo owner as a result of the casualty occurring during the voyage.

We also attach an executed standard form of Average Agreement for your use.

In accordance with the average agreement, libelant thereafter appointed Manley Hopkins, Son & Cookes (Hopkins) of London as average adjuster. Esso International, Inc., like respondent, a wholly-owned subsidiary of Standard Oil Company (New Jersey), was advised, and approved, of the appointment. On March 1, 1965, Hopkins submitted to both parties a general average statement which computed respondent's liability for general average contribution in an amount in excess of one hundred thousand dollars. After respondent's failure to make payment of all or any part thereof, libelant commenced these proceedings, alleging two causes of action: (1)

Breach of contract, on the theory that the general average agreement of October, 24, 1965, is conclusive and binding upon the parties and requires payment of the contribution set forth in the Hopkins general average statement; (2) An action under general principles of maritime law on the ground that whether or not the general average statement *per se* establishes such liability, respondent as a cargo owner is liable in general average in the amount of the contribution set forth in the general average statement. In its answer respondent denied that it was bound by the general average statement and also denied that it was bound to contribute in general average.

At a pre-trial conference on November 22, 1966, both parties requested the Court, in advance of trial and after a hearing, to decide the following questions: (1) Is the general average statement conclusive as to the rights and obligations of the parties? (2) If the statement is not conclusive, who has the burden of proof to establish the correctness or incorrectness of the computations in the general average statement? (3) If the statement is not conclusive, who has the burden to show that the stranding was due to an error in navigation? and (4) If the statement is not conclusive, who has the burden to prove that the stranding was the result of unseaworthiness and occasioned by the owner's failure to exercise due diligence to make the vessel seaworthy? These questions present preliminary issues the resolution

the amounts shown by said statement to be due from us respectively.

We do hereby severally promise and agree to furnish promptly, on request of said adjusters, all such information and documents as they may require to prepare said statement, and in the event of inability or failure to do so in respect to any shipment or shipments said adjusters are authorized to prepare said statement on such information as they can by reasonable diligence obtain, and such statement shall be binding as respects the information so acted upon; but if thereafter, proper information and documents are furnished the adjusters and request is made that such statement be

amended, it shall be amended, provided the party making the request pays the expenses of preparing, and collecting under the amendment, but the vessel owners, adjusters and trustees shall be under no responsibility in respect of any payment or distribution to or settlement with any other interest, which may have been previously made under the original statement.

This agreement may be executed in several parts, which shall constitute one agreement, by the parties of the second part, and, upon such execution, and the release of said cargo by the parties of the first part, shall have full force and effect.

of which are clearly appropriate prior to trial.

## I.

■ The law of general average derives from the Rhodian maxim "that if merchandise is thrown overboard to lighten the ship, the loss occasioned for the benefit of all must be made good by the contribution of all."[5] The principle embodied in this maxim—that loss for the common benefit which is incurred by one who partakes in a maritime venture should be shared ratably by all who participate in the venture—may quite likely pre-date the Rhodians and be grounded in an ancient and customary undertaking by owners of cargo that if one of their number should suffer loss during a voyage through lightening of the ship, all who had profited through the voyage would pay their share to make that loss good.[6] Contribution in general average was a maritime principle recognized by the Romans and one which survived the fall of the Roman Empire and retained a hold among seafarers throughout the middle ages. Gradually the principle received formal recognition in written codes and digests.[7] The right to general average contribution, in modern times, is a principle of general maritime law recognized by "all the principal maritime nations."[8] Current law and practice relating to the adjustment of general average is for the most part determined by reference to the York-Antwerp Rules of 1950,[9] which are not of themselves binding as law but which are generally incorporated in charter parties and bills of lading and are thereby made binding by contract as between the parties.

■ The question of whether or not all or any part of the loss suffered by ship or cargo or both is a general average loss depends upon how much, if any, of the damage was sustained in connection with efforts for the common good of both ship and cargo. For example, damage incurred in this case in the CLYDE-WATER's "going on" the Silver Bank would seem hardly to qualify as general average loss under normal circumstances. On the other hand, damage suffered in "carry off" would usually be expected so to qualify. See e. g., Navigazione Generale Italiana v. Spencer Kellogg & Sons, 92 F.2d 41, 44 (2d Cir. 1937).

■ From an early date it appears to have been the duty of the ship to declare general average and make the necessary and proper adjustment. Ralli v. Troop, 157 U.S. 386, 400, 15 S.Ct. 657, 39 L.Ed. 742 (1895). "The reason why the shipowner usually acts in the premises is because in most cases there is a balance of general average due to him, and also because, if cargo has been sacrificed, he is under a duty to that cargo to obtain security from the other cargo." Kohler & Chase v. United American Lines, 60 F.2d 530, 533 (S.D.N.Y.1932) (report of special commissioner prefacing order of court approving that report). Pending a general average adjustment the ship has "a lien upon the cargo for such contributory share as, under the facts of the case, the cargo owners might be bound to pay * * *." The Agathe, 71 F. 528, 530 (S.D.Ala. 1895).[10] Practical necessities, which

---

5. 2 The Digest of Justinian 385 (Monro transl. 1909, Digest 14.2.1).

6. R. Lowndes & G. Rudolph, The Law of General Average 3–4 (9th ed. 1964) [hereinafter cited as Lowndes & Rudolph]. The ninth edition of this standard treatise on general average appears as Volume 7 in the series entitled "British Shipping Laws."

7. For an analysis of the sources of the law of general average, see Lowndes & Rudolph 3–46.

8. G. Gilmore & C. Black, The Law of Admiralty 220–21 (1957) [hereinafter cited as Gilmore & Black].

9. The text of these rules with commentary is set out in Lowndes & Rudolph 288 et seq.

10. Conversely, the ship may be called upon to contribute in general average and cargo owners may assert liens against the vessel for its proportionate contribution. The Emilia S. De Perez, 22 F.2d 585, 586–587 (D.Md.1927).

dictate that neither goods nor ships can long suffer removal from the channels of commerce, make enforcement of contribution through lien proceedings exceedingly undesirable to all engaged in maritime ventures. This consideration has led to "the almost universal practice * * * for the master, before delivering the goods, to take an average bond, and for the owners of the cargo to give such a bond." Wellman v. Morse, 76 F. 573, 579 (1st Cir. 1896). Such bonds, more generally referred to as general average agreements, are undertakings on the part of one who may be liable in general average to pay such contribution as may be found to be owing by him. General average agreements are sometimes executed and cargo discharged, as in the present case, upon this undertaking alone. In other instances the agreement is "in the form of a bond with surety, sometimes accompanied by a deposit, and sometimes guaranteed by the underwriters." Corrado Societa Anonima D. v. L. Mundet Sons, 18 F. Supp. 37, 41 (E.D.Pa.1936).

■ In addition to the desire to avoid delay and tie-ups of either ship or cargo, another important reason why it is most undesirable for general average contribution to be dependent upon enforcement of liens is the fact that adjustment of general average is a highly complex matter which usually, at least in modern days, requires preparation of a written statement setting forth the intricate computations pursuant to which contributions, said to be owing, are determined. In the context of current maritime complexities, such statements may be a number of years in preparation. See e. g., Chandris v. Argo Ins. Co., [1963] 2 Lloyd's List L.R. 65, 72–73, 75; Rebora v. British & Foreign Marine Ins. Co., 258 N.Y. 379, 180 N.E. 90, 91 (1932). Although the shipowner appears always to have had the right to prepare his own average statement, a group of professional average adjusters has made a specialty of this often arduous task. "[T]he members of this profession enjoy a very high reputation for fairness to ship and cargo alike," and their services are customarily sought whenever there is a situation of general average.[11] It is, for instance, the practice of insurers on the London marine insurance market not to pay the claims of their insureds arising out of general average "unless and until a professional average adjustment has been made and presented * * *." Chandris v. Argo Ins. Co., supra, [1963] 2 Lloyd's List L.R. at 75. The high esteem which this profession commands and the vital function that it performs have been described as follows:

It is a striking fact that litigation involving general average rarely reaches the courts any more. There have been perhaps thirty reported cases in the last twenty years, and these have been mostly concerned with the question whether general average was payable at all, and not with the details of adjustment. Using the Rules of Practice of his Association, and the insight and know-how derived from experience in a profession with a high *esprit de corps*, the adjuster performs a function which, in one sense, is judicial in character, settling claims on the facts and the law. If his profession did not exist, and his work came to the courts in great volume, they would undoubtedly find it a heavy burden to handle. But the adjusting profession does its job so well that the vast majority of the claims with which it deals are processed to the satisfaction of the community concerned, and the courts never hear of them. This phenomenon might be looked on— along with the growing practice of arbitration in all maritime cases—as part of a swing back to the medieval custom by which the members of the mercantile community adjusted their disputes among themselves, without recourse to the general judicial system.[12]

11. Gilmore & Black 225.

12. Id. at 226–27.

The unique position of the professional average adjuster is all the more remarkable in view of the fact that, in the absence of agreement to the contrary, the fruit of all his labor—the general average statement—is without any legal effect whatsoever. Where the shipowner unilaterally engages the services of a professional average adjuster it is "merely as a matter of business convenience on his part" and the resulting statement is "put forward by the shipowner as representing his view of the general average rights and obligations, but the statement or adjustment is open to question in every particular by any of the parties who may be called on to contribute." Wavertree Sailing Ship Co. v. Love, [1897] A.C. 373, 380. "In the absence of some stipulation on the subject, * * * his [the average adjuster's] function [is] only that of aiding or assisting the owner in gathering and stating data and making appropriate calculations as a suggested basis for an adjustment to be made by the owner, or under the owner's direction." United States v. Atlantic Mut. Ins. Co., 298 U.S. 483, 491, 56 S.Ct. 889, 891, 80 L.Ed. 1296 (1936). It is completely clear that an average statement under these circumstances is legally *ex parte,* The Nesco, 47 F.2d 643, 646 (S.D.N.Y.1931), and that "in the absence of express contractual provision * * * the insurer, or another party to the adventure is free to say that the adjustment is wrong, on the facts or the manner of computation, or both." Chandris v. Argo Ins. Co., supra, [1963] 2 Lloyd's List L.R. at 76. In such cases "the shipowner must prove his case in the Courts, and he does not prove it by merely producing an average adjustment, even one prepared by an independent professional adjuster." Id. at 76. Similarly, in the absence of an agreement to the contrary, the average adjuster does not act as an arbitrator. United States v. Atlantic Mut. Ins. Co., supra, 298 U.S. at 491, 56 S.Ct. 889; The Agathe, supra, 71 F. at 531; The Alpin, 23 F. 815, 819 (E.D.N.Y.1884); E. Congdon, General Average 152 (2d ed. 1923); M. Hopkins, Handbook of Average 359–60 (1857).

As previously stated herein, a general average statement is without legal effect and is open to question in every particular, *in the absence of any agreement to the contrary.* However, the parties may in a general average agreement determine for themselves what effect will be given the general average statement. See, e. g., Rebora v. British & Foreign Marine Ins. Co., supra, 258 N.Y. 379, 180 N.E. at 91. The parties may even agree that the statement shall be conclusive both as to the issue of liability and as to the computation of the amount of liability. See id., 258 N.Y. 379, 180 N.E. at 91–92. Therefore, in construing an agreement, express or implied, between the parties concerning the effect of the general average statement, cases which deal with the effect of *ex parte* average statements are inapposite. See, e. g., Corrado Societa Anonima D. v. L. Mundet Sons, supra, 18 F. Supp. at 41, distinguishing The Nesco, supra, and United States v. Atlantic Mut. Ins. Co., supra. In this case the parties entered into a general average agreement. Thus, the issue presented is the legal effect, if any, of that agreement.[13] Two cases have dealt with general average agreements similar to the one with which the Court is herein concerned.

In Corrado Societa Anonima D. v. L. Mundet Sons, supra, the ship contended that regardless of the cause of the ship's stranding, an average agreement similar to the one in this case[14] bound cargo to

13. The terms of the general average agreement in the present case are set out at note 4 supra. Respondent's covering letter, dated October 24, 1963, which relates to that agreement is quoted in the body of this opinion.

14. The Court's description of the agreement was as follows: "[T]he cross-

respondent, in order to obtain delivery, signed an agreement which is in evidence by which it covenanted that '* * * so much of the losses and expenses aforesaid as upon an adjustment of the same to be stated by Johnson & Higgins, Average Adjusters, according to the provisions of the contract of affreightment

pay the amount shown to be due by the average statement. The Court rejected that contention and held that the case was not one for general average because the stranding was caused by negligent navigation and that the ship was not entitled to any contribution in general average,[15] the average statement notwithstanding. In discussing the effect of the average statement, the Court stated that it did not "find that the contention has ever been made that the legal operation and effect of an average agreement of this kind is anything more than to fix the measure of the obligor's liability and secure payment of the amount unless it shall afterward appear that it was not a case for general average." 18 F.Supp. at 40. It does not appear that the cargo, in the *Corrado* case, in questioning the ship's contention that the general average statement was binding, directed any challenge to the validity of the computations contained in the statement. Rather, in that case, cargo addressed itself solely to the question of whether or not the statement was conclusive as to liability. The Court took the view that the statement was not conclusive as to liability and that cargo might deny the entire liability. In affirming the judgment of the District Court, the Third Circuit stated: "The learned trial judge in his discussion of this question has made it clear that the agreement here was not one to pay a general average contribution but an agreement upon the sum payable, if any." Corrado Societa Anonima D. v. L. Mundet & Son, 91 F.2d 726, 726–727 (3d Cir. 1937).

In Navigazione Generale Italiana v. Spencer Kellogg & Sons, 1936 A.M.C. 1765 (S.D.N.Y.1936), a substantially similar general average agreement was before the Court.[16] In the District Court cargo contended that even if it were conceded that the adjusters' statement of the amount was correct, the question of whether or not cargo was liable at all in general average was still an open one. 1936 A.M.C. at 1766. The District Court sustained this contention and wrote:

Whatever the amount of the shipowner's losses and expenses, under the terms of the contract there was to be no recompense for them by the cargoowner unless they were of a type "which may constitute a charge by way of general average." I discover no warrant for treating the document as conferring on the adjusters authority to inquire into or to decide which of the ship-owner's losses and expenses were of that type or to say that the cargo-owner was liable to contribute toward payment of them. In other words, the agreement means that unless such losses and expenses in fact should be of a character which rendered them "a charge by way of general average," no liability was assumed by the cargo-owner to bear any portion of them. It was not at all within the scope of the employment of the adjusters to consider or to say whether all or any of the losses and expenses came within the class of general average. Their sole task was to compute how much were the losses and expenses of the ship-owner growing out

---

and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, * * * shall be paid by us. * * * * '" (18 F.Supp. at 40).

15. The charter party in *Corrado* did not contain a Jason Clause. 18 F.Supp. at 40.

16. The agreement in that case was summarized in the opinion of the Second Circuit on appeal as follows: " 'that so much of the losses and expenses * * * as upon an adjustment of the same to

be stated by Johnson & Higgins, Average Adjusters, according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, or to be due from us, shall be paid by us respectively, according to our ratable proportion thereof, to the owners of said vessel, or Johnson & Higgins, in and for settlement in accordance with said statement.' " Navigazione Generale Italiana v. Spencer Kellogg & Sons, 92 F.2d 41, 44 (2d Cir. 1937).

of the stranding of the *Minico* "after leaving Rosario" and thereafter being "floated by working her engines," referred to in the first preamble. Having found the amount of these, they had no concern with who should pay them or whether any portion of them was chargeable against the cargo-owner.

If it had been the purpose to refer the issue of liability *vel non* to arbitration, I think more appropriate language to that end would have been used. * * * [1936 A.M.C. at 1768]. The District Court then went on to hold that there had been no act of general average and that the ship was therefore entitled to no contribution. On appeal, the Second Circuit in an opinion by Judge Augustus N. Hand reversed the District Court's holding that there had been no act of general average and entered a decree for the ship in the amount of its proportionate contribution as stated in the general average statement. Navigazione Generale Italiana v. Spencer Kellogg & Sons, supra, 92 F.2d at 41. With regard to the effect of the general average statement, Judge Hand wrote:

It is not necessary to say that the agreement contemplated a submission to the general average adjusters of the issue whether the case was one of general average. * * * We have, therefore, discussed the evidence bearing on that question and have found that the situation was such. We think that the agreement did contemplate the submission of the amount of the expenditures and what proportion of general average expenses should be borne by the cargo. Upon examination of the statement of the adjusters we find that the expenditures classed by them as general average expenses were proper ones. Nor do we find any attacks made upon the adjustment by the respondent other than certain claims that the case was not one for general average and that the vessel was unseaworthy. None of these general criticisms is borne out by the record. Accordingly we have a situation where

a case for general average has been established, no successful attack has been made on any item allowed by the adjusters, and the respondent has agreed to pay the amount found due. [92 F.2d at 44–45].

It would seem that these cases stand for the proposition that a statement prepared pursuant to a general average agreement such as the one before the Court in this case is not conclusive as to the issue of whether or not there is any liability to contribute in general average. Beyond that, however, the effect of the *Corrado* and *Spencer Kellogg* cases is by no means clear. Of those cases it has been written:

Two cases, from different circuits, seem to diverge on the effect, as to the bindingness of the adjuster's determinations, of the cargo underwriter's having signed a standard agreement to pay "so much of the loss and expenses * * * as upon an adjustment of the same to be stated by * * * [the designated adjusters] * * * according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo * * *." In Corrado Societa Anonima Di Navigazione v. L. Mundet & Son, it was held that this was an agreement merely to pay such sum as might be due under the contract of affreightment, and law and usage; the adjustment was held to have no binding effect. The Second Circuit Court of Appeals, in Navigazione Generale Italiana v. Spencer Kellogg & Sons, treated a similar clause in a somewhat less clear way; some language of the court might lend support to the view that the "agreement" was held to be an agreement to abide by all the determinations of the adjusters, but the opinion emphasizes that all the items allowed actually seemed proper, and that "no successful attack" had been made on any of them. This opinion may merely mean, then, that an "agreement" of the sort quoted stipulates only that the adjustment shall be taken

to be correct *prima facie*. If it means more than that, then it seems clear that at the least an ambiguous agreement is being pushed too far. On familiar principles, such an ambiguity, if it exists, ought to be resolved against the party who drew the agreement. Indeed, one might go further and say that the agreement is not ambiguous at all, but on its face only binds the signer to pay what is really due, " * * * according to the provisions of the contract of affreightment and to the laws and usages applicable * * *." [17]

▮ While this Court has little difficulty in holding that the general average statement in this case is not conclusive as to whether or not respondent is liable to pay any general average contribution, the remaining question of what effect, if any, to give the statement is clearly not free from doubt. "It is not a case of black on one side and white on the other. It is grey and misty either way." The Caserta, 1932 A.M.C. 51, 58 (S.D.N.Y.1931) (oral opinion of Mack, J.).

The conclusion that the general average statement in this case is *prima facie* evidence, as defined herein,[18] is supported by Judge Hand's opinion in *Spencer Kellogg*. In the absence of proof to the contrary, the appellate court in that case accepted the items set forth in the general average statement as properly allocable to general average contribution and also accepted the amounts and computations therein set forth. It would seem that Judge Hand's statement that the agreement contemplated "submission of the amount of the expenditures and what proportion of general average expenses should be borne by the cargo"

should be read in the light of the apparent lack of attack by cargo on the adjuster's computations in that case and not as an expression by Judge Hand that a general average adjuster's determination with regard to amount and proportion are to be taken as binding in every case. In the case at bar, as in *Spencer Kellogg*, the precise language of the agreement itself does not provide for greater effect to be given the adjuster's computations and determinations as to values than to his determinations as to which items were properly includable as damage of a general average nature. Thus it can be argued that to read such an agreement as binding cargo to the adjuster's statement in any respect or in any degree would be the equivalent of pushing an ambiguous agreement too far.[19]

On the other hand, to hold the general average statement to be without any effect whatsoever would seemingly go even farther in the other direction. It is difficult to conceive that the ship, in discharging cargo's petroleum upon execution of the agreement in this case, intended to surrender its lien and/or its right to demand security in return only for cargo's promise to cooperate in the preparation of a legal nullity. Similarly, it is difficult to conceive that cargo, in executing the agreement, considered that it was getting an immediate something (an unencumbered cargo of petroleum products worth $232,638) for nothing more than an agreement to pay that which it would be obligated to pay in any event. It may be that in the execution and acceptance of such an agreement ship and cargo had in mind only an interest which through commercial necessity was common to both—that the ship be relieved of her cargo and that both ship

17. Gilmore & Black 227–28.

18. What is meant herein in saying that the general average statement *is prima facie* evidence is that "in the absence of any evidence tending to contradict it, in whole or in part, it would compel a direction by the court to the jury, assuming that it is a case of general average." The Caserta, supra, 1932 A.M.C.

at 56. Once evidence tending to contradict the statement in whole or in part has been introduced, then, as is discussed below, the question of which party has the burden of proof is separate and distinct from the question of the *prima facie* effect of the statement.

19. See Gilmore & Black 228, quoted above in the body of this opinion.

and cargo be thereby freed to proceed to their appointed destinations. But the complexities of general average and the high standing of the profession of average adjuster are such that this Court is not prepared to conclude that the parties contemplated the preparation of a highly elaborate but legally worthless scrap of paper.

A holding that a general average statement prepared pursuant to the agreement of the parties in this case constitutes *prima facie* evidence to the extent which will be defined herein would seem to be firmly buttressed by consideration of the practicalities of litigation involving general average statements. In *The Caserta*, supra, Judge Mack, in the course of determining whether or not a general average statement was admissible as evidence, considered contractual provisions somewhat different from those which are before this Court in this case.[20] However, Judge Mack's opinion contains reasoned and lengthy *dicta* concerning the practical considerations relevant to the question of whether or not a general average statement should be given the effect of *prima facie* evidence. In this connection Judge Mack commented:

If such document is properly and legally receivable in evidence in this court as *prima facie* proof of the facts, either in whole or in part, thus stated by the adjusters on the basis of this hearsay evidence, and of their calculations and conclusions based thereon, it might necessitate the calling by the defendant of those who would normally be the plaintiff's own witnesses to contradict the statements theretofore made by them. In other words, it might necessitate a defendant calling them for the purposes of cross-examination. It may well be, if so called, that the Court will permit them to be cross-examined and not charge the defendant with having called them as his own witness, or the Court might, in its discretion, call such as the defendant desires to have called, and submit them to a cross-examination by the defendant.

Now, especially in a court of common law, with a jury, a proceeding which in my judgment ought long

---

**20.** The average agreement in *The Caserta* is set out as article 32 of the bill of lading at 1932 A.M.C. at 52–53, and reads as follows:

"Art. 32. In case of general average, the adjustment shall be made at Genoa at the request of the Ship-owning Company, in an amicable way through two adjusters selected among the Expert Public Accountants registered at the Board of the Province of Genoa and appointed by the Ship-owning Co. by specific authority given to the said Company, from this moment by the Shipper for himself and others interested with him (*e suoi aventi causa*) herein, the shipper and the consignee waiving all objections in this respect. All consignees agree to deposit with the Ship-owning Company or its Agency, the amount requested by the said Company as a guarantee for the contribution which they may be called to pay in the average adjustment. Having effected such deposit, paid the freight and every other amount chargeable to the merchandise and signed the agreement as stated above for the General Average Adjustment, they shall be allowed to take delivery of the merchandise. The amount fixed as a guarantee for the average contribution shall not be subject to contestation and shall be deposited immediately, the right of lien in favor of the Ship-owning Company as contemplated in art. 23, remaining unaltered and in force."

Thus, the average agreement in *Caserta* did not contain the clause which was involved in *Corroda* and *Spencer Kellogg* and which is involved in the instant case—the clause under which cargo agrees that "so much of the losses and expenses aforesaid as upon an adjustment of the same to be stated by * * * Average Adjusters, according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, or to be due from us, shall be paid by us respectively, according to our ratable proportion thereof, to the owners of said vessel, * * * in and for settlement in accordance with said statement." (See the third unnumbered paragraph in note 4 supra).

since to have been held highly improper for this kind of a case but which I must accept as entirely proper because entirely legal, it seems to me that a procedure of the kind indicated would be extremely enormous; on the other hand, it must be fully and frankly conceded that the failure to admit such hearsay evidence as *prima facie* proof would compel the plaintiff in a proceeding which under the law he has an absolute right to institute in this common law court in a case like this to go forward with an enormous amount of proof that might take months, which might be, except for the cross-examination that would be available to the defendant, in a large measure a duplication of the work that had been done by the adjusters. I clearly see the evils in either aspect. [1932 A.M.C. at 58].

Although it is, as Judge Mack indicates, not an issue free from difficulty, it would seem that the availability under the Federal Rules of Civil Procedure of equitable and thorough discovery procedures has tipped the balance against requiring a party claiming contribution under a general average statement "to go forward with an enormous amount of proof that might take months, which might be, except for the cross-examination that would be available to the defendant, in a large measure a duplication of the work done by the adjusters." In view of the recognized competence of professional adjusters it is highly doubtful that a party who disputes the correctness of a general average statement will press such dispute against more than a very limited number of items. Discovery, in effect, provides a means whereby the general average statement may be made the subject of cross-examination prior to trial. In these circumstances, to hold that the statement is *prima facie* evidence in the sense and to the extent described herein would not seem to do injustice to either party, particularly where, as discussed below, the ultimate burden of proof is upon the party claiming under the statement. Dis-

covery provides a means whereby the party who challenges the statement can determine and preserve for trial those aspects of the statement which he wishes to dispute. At the same time, giving *prima facie* effect to the statement works to admit those aspects of the statement which are not disputed, without putting the party claiming under the statement to the awesome task of affirmatively proving by independent evidence each and every item set forth in the statement, whether the subject of dispute or not.

Affirmatively stated, a general average statement is *prima facie* proof of (1) the losses, damages and expenses which as factual matters are the direct consequence of a general average act, (2) the values attaching to such losses, damages and expenses, and (3) the computations proportioning these losses, damages and expenses between the parties to the venture, i. e., here ship and cargo.

The distinction between whether or not there is liability to contribute in general average and the issue of what items of damage are the direct consequence of a general average act is not entirely easy to draw. The former relates to the broad question of whether or not there was any "general average act"—defined in Rule A of the York-Antwerp Rules, 1950, as "any extraordinary sacrifice or expenditure [which] is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure." As stated above, a general average statement has no bearing upon that question and is not evidence of whether the circumstances amount to such an act. The adjuster is in no better position than the courts to determine such questions, which are for the courts alone to decide in the absence of agreement by the parties to be bound by an adjuster's (or arbitrator's) decision. If no such agreement has been entered into, then the party claiming general average contribution must prove by evidence independent of a general average statement

that a general average act occurred. In this case, for instance, the ship must prove by independent evidence that there was a stranding and a coming off of the strand and that the circumstances relevant to the freeing of the CLYDEWATER amounted to a general average act. It must also be kept in mind that determinations of whether or not certain broad categories of damage, which by custom and rule are generally conceded to be properly includable or, less often, excludable as items of general average, require the resolution of issues which are primarily legal. As to those issues the general average statement has no effect. For instance, under the York-Antwerp Rules, 1950, damage to the machinery and boilers of a stranded and imperiled ship incurred in efforts to refloat her is a type of damage which is properly includable in general average, but loss or damage caused by cutting away the wreck or remains of spars or of other things which have previously been carried away by a sea peril is not general average damage. York-Antwerp Rules, 1950, Rules IV and VII. The adjuster's determinations with regard to whether damage qualifies as such an item of general average damage are of no effect whatever.[21] Assuming the existence of a general average act, however, and also assuming a determina-tion that one or more given items of claimed damage are within the category of damage allocable in general average, the general average statement becomes *prima facie* evidence that any item of damage so claimed is properly included as an element of general average contribution in the amount and proportion attributed to the item in the general average statement. For instance, if in the present case it is established that the CLYDEWATER was freed from the strand and that its refloating constituted an act of general average and that damage to its boilers under the circumstances is a category of damage to be included in general average contribution, then inclusion by the adjuster of boiler damage will be *prima facie* evidence that there was damage to the boilers, that such damage was a direct consequence of the general average act, that the damage was in the amount and proportion stated, that the monetary loss attaching to such damage is as stated, and that the apportionment of the amount of such damage has been properly computed among the parties to the venture. Such questions relate mainly to factual determinations which the adjuster, with the resources available to him and in view of his admitted expertise, is eminently qualified to make.[22]

21. Another example of items which are usually excluded from general average adjustments is illustrated by the following comments in The Santa Anna Maria, 49 F. 878, 880 (D.S.C.1892):

The testimony does not enable the court to reach the conclusion that the articles specified were jettisoned from the hatch next forward of the main hatch, nor can it be ascertained what articles from this hatch really were jettisoned, if indeed any were. All these must be excluded from the general average adjustment. It is not inappropriate to quote here the language of Lowndes on General Average, (4th Ed. § 22, p. 92).

"Many ships are lumbered with all kinds of useless articles on deck, which increase the risk, and are sure to be thrown overboard on the first approach of danger. To guard against the abuse of this practice the rule in England, as in Germany and most other states, in that jettison of ship's materials off the upper deck is not treated as general average, unless it be of such articles as are necessary for the navigation of the ship, and therefore are carried on deck in conformity with the custom of the trade. Boats, studding-sails and their gear, spare spars, anchors, are examples of articles properly carried on deck. Water-casks, provisions, spare sails, cables, ought not to be. Hawsers, in coasting trades or for short voyages, may properly be on deck, though for a long voyage they should be got below as soon as they are dry."

22. As discussed below in the body of this opinion, the burden in regard to proving any component of the general average statement, as distinct from the *prima facie* effect thereof, is upon the ship in this case. What will be regarded as "evidence tending to contradict [the state-

The Court holds that the instant general average statement is *prima facie* evidence in the sense described above.

## II.

As has been noted, the *prima facie* effect attaching to the general average statement in the instant case is complemented by considerations concerning which party has the ultimate burden of proof with regard to those aspects of the statement which are *prima facie* evidence. There is no doubt as to which party has the burden to prove that any given item of loss or expense is includable as general average. That question, for purposes of the present case in which the York-Antwerp Rules, 1950, were incorporated in the bill of lading, is settled by reference to Rule E of those Rules, which provides that "the onus of proof is upon the party claiming in general average to show that the loss or expense claimed is properly allowable as general average." York-Antwerp Rules, 1950, Rule E.

 Also, a review of the scant authority on the subject indicates—and this Court so holds—that the burden to establish the correctness of the computations in the general average statement is here on the ship, i. e., the party seeking general average contribution.

In Compania Trasatlantica v. Charles Pfizer & Co., 96 F.Supp. 217 (E.D.N.Y. 1951), the question arose as to whether

the average adjuster's application of a rule which was inappropriate in that case affected the amount of the award charged to cargo. The Court held:

> In this action the burden of proof is on libelants [the ship] to prove by a fair preponderance of the evidence that they are entitled to the amount claimed in accordance with the exact provisions of Clause 14 of the bills of lading. Since one of the Rules specifically excluded from Clause 14 was in fact applied by the adjusters, the burden is on libelants to show that it did not affect the amount they claim herein. [96 F.Supp. at 219–220].

In The Santa Anna Maria, 49 F. 878 (D.S.C.1892), the ship claimed general average and had a statement prepared which was held by the court not to be conclusive. Evidence revealed some suspicion "that there was great exaggeration, both in the alleged condition of the bark, and in the number and value of the articles jettisoned." 49 F. at 880. The Court held that it was the "duty of the libelant [the ship] to make out his case by the preponderance of credible evidence" and went on to exclude certain articles from the average adjustment. In Kohler & Chase v. United American Lines, supra, cargo claimed that the amount shown to be due on a general average statement prepared by professional adjusters pursuant to an average agreement understated the amount to which they were ac-

---

ment], in whole or in part" (see note 18 supra) which will thereby overcome the *prima facie* effect of the statement and submit the party claiming general average to that burden of proof will vary with the circumstances. In this case, for instance, the parties are in disagreement as to what proportion of the total damage to the hull of the CLYDEWATER was incurred in going on the Silver Bank as opposed to coming off. Assuming, without at this time deciding, that the ship is entitled to general average contribution only for the latter, it is necessary to reach a determination as to the exact proportion of total hull damage incurred in coming off. The adjuster's determination on this issue will be regarded as *prima facie* correct. But in

regard to so speculative a matter as apportioning total hull damage between going-on and coming-off damage, the expertise of the adjuster is entitled to less weight than in connection with the assignment of values to ship and cargo and analyses of repair bills. Although the Court does not at this time reach or decide any factual issue, the Court does note that the surveyor's initial report to the United States Salvage Association assigned a proportion of 88.1 per cent. of all damage to refloating but that this report was subsequently withdrawn in part because "visual examination of Vessel while lying on drydock at Baltimore, Maryland, gave no indication as to whether the damage was due to the grounding and/or efforts to refloat."

tually entitled. The Court approved the Special Commissioner's Report which included the statement that when cargo filed their libel they "came into court with an admission on the part of the shipowner that a certain amount became due to them in general average" and that "[t]he burden [was] on libelants to satisfy the court that they are entitled to more than that amount." 60 F.2d at 535. The Special Commissioner, however, indicated that if the case were one in which the statement set forth a debit balance against cargo and the ship had brought the libel to recover that balance, the burden of proving the amount due would rest upon the ship. 60 F.2d at 533.

### III.

Formerly a party whose negligence caused a maritime loss could not recover in general average. The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130 (1898). Carriers have, however, made it a standard practice to insert in bills of lading contractual provisions requiring contribution in general average even where the loss is the result of the carrier's negligence if the carrier is exempt from liability for such negligence by statute, contract or otherwise. These provisions were held valid and enforceable in The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912).[23] "Jason" Clauses, such as the one involved in this case, provide for contribution even if the loss is due to negligence "for which the owner is not responsible by statute, contract or otherwise." [24]

Cases in which the benefits of the Jason Clause have been invoked have generally involved a claim by the carrier that it is not responsible under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., for an act of negligence which the opposing party may seek to attribute to it. Section 4(1) and subsections (a) and (q) of section 4(2) of that Act, 46

U.S.C.A. §§ 1304(1), 1304(2) (a) and (q), provide as follows:

(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

\* \* \* \* \* \*

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

The effect of the combination of the new Jason Clause and the Carriage of Goods by Sea Act is that once a general average act within "traditional bounds" is established,[25] cargo will be required to contribute in general average even if the general average loss is due to a cause, such as an error in navigation

---

**23.** For a discussion of these developments see Gilmore & Black 243–44.

**24.** See paragraph 37 of the charter party quoted at note 2 supra.

**25.** See Gilmore & Black 245.

attributable as negligence to the carrier, if it is determined that the carrier would not be responsible to cargo under the Act for loss resulting from such cause. The ultimate inquiry in this regard, therefore, concerns whether or not the carrier is entitled to the benefit of one or more of the exemptions from responsibility provided in the Act. Thus, the ship's right to recover general average contribution from cargo in this case presents precisely the same question as would be involved if cargo were herein seeking to hold the ship liable for damage to cargo's goods.[26]

In the absence of a Jason Clause, the burden of proof lies upon a ship claiming contribution in general average to show that the loss occurred without its fault. Phipps v. The Nicanor, 44 F. 504 (C.C.S.D.N.Y.1890): [27] see also The Irrawaddy, supra. Thus in cases in which the existence of a Jason Clause makes relevant the immunities provided by the Carriage of Goods by Sea Act, a claim by cargo that it is not liable to contribute in general average on the ground that the damage which is the subject of the ship's claim was the result of a cause which would bar recovery by the ship in the absence of a Jason Clause presents the ship with two alternatives. On the one hand the ship may in effect admit that the loss resulted from a cause which would bar recovery absent a Jason Clause but at the same time seek to establish the facts necessary to show the applicability of one of the

immunities specified in section 4 of the Carriage of Goods by Sea Act. In attempting to establish any of those immunities, the ship has the burden of proof. Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 431–432 (2d Cir. 1962) (Friendly, J.) ; cf. Clark v. Barnwell, 53 U.S. (12 How.) 272, 280, 13 L. Ed. 985 (1851). On the other hand, the ship may contend that the loss was occasioned by a cause for which it would not be barred from recovery in the absence of a Jason Clause. This amounts to a contention that the cause of the loss did not involve fault attributable to the vessel or her owners. See The Portsmouth, 76 U.S. (9 Wall.) 682, 19 L.Ed. 754 (1870). Here again the burden of proof lies upon the ship. Phipps v. The Nicanor, supra. In practical effect these alternatives amount to the same thing since any attempt to establish the cause of the loss will involve showing that the damage occurred as a result of one or more of the causes specified in section 4(1) or in subsections (a)–(p) of section 4(2) of the Carriage of Goods by Sea Act or that the case falls within the "catch-all" provision of subsection (q).[28] Thus where cargo, as in this case, denies liability on the ground that the damage was caused by negligence attributable to the ship, the ship must inevitably establish one of the immunities provided in section 4(1) or in section 4(2) of the Act in order to avail itself of the benefits of the Jason Clause and establish its right to general average contribution.[29]

26. Id. at 244.

27. "To any action upon such claim, whether backed by a general average bond or not, negligence causing the stranding would be a full defense. Nay, more, the ship could not establish such claim **upon proof** of the bare fact that she stranded; she would have to show sufficient of the attending circumstances to warrant the inference that she stranded without fault." 44 F. at 509–510.

28. To avail itself of certain of the immunities provided in section 4, the ship would not only have to establish that the loss was occasioned by the cause to which the immunity relates but would

additionally be required to establish that such cause was operative without fault on its part. See, for example, sections 4(1) and 4(2) (q). This is not true with regard to section 4(2) (a).

29. Alternatively the ship might, in accordance with the terms of the Jason Clause, seek to establish that the loss was occasioned by a cause for which it was not responsible under some statute other than the Carriage of Goods by Sea Act or for which it was not responsible by "contract, or otherwise * * *." Cases which are litigated in the courts of the United States, however, usually seem to involve attempts

As noted above, in attempting to establish any one of those immunities, the ship has the burden of proof. Lekas & Drivas, Inc. v. Goulandris, supra, 306 F.2d at 431–432. In this case, for example, the ship has indicated that it may wish in the course of this litigation to establish that the stranding of the CLYDEWATER was due to an error in navigation for which it is not responsible under section 4(2) (a) of the Act. If so, the ship would assume the burden of proving that the stranding was caused by such an error.

 Cargo in this case has also raised the contention that it is not liable to contribute in general average on the ground that the stranding of the CLYDEWATER was caused by the vessel's unseaworthiness. Provision for immunity from responsibility for loss occasioned by unseaworthiness is provided in section 4(1) of the Act and to avail itself of that immunity, as is the case with the immunities specified in subsections (a)–(p) of section 4(2), the ship would assume the burden of proving that the loss occurred as a result of that specified cause. If the ship chose to do this, it would also as specifically provided in section 4(1) of the Act assume the burden of proving due diligence on its part to make the ship seaworthy.

 As noted above, the ship has indicated that it will seek to establish that the stranding was owing to an error in navigation for which it is not responsible under section 4(2) (a) of the Act. As cargo has in this case denied liability to contribute in general average both on the ground that the loss was occasioned by negligence attributable to the ship and on the ground that the ship was unseaworthy, the question arises as to whether the ship must establish facts sufficient to show the applicability of more than one of the immunities provided by section 4 of the Carriage of Goods by Sea Act. Thus, for example, assuming that the ship successfully meets its burden of proving the applicability of section 4(2) (a), must it show that the loss was due *entirely* to an error in navigation for which it is not responsible and negate all other possible causes?

Judge Friendly faced much the same issue in Lekas & Drivas, Inc. v. Goulandris, supra. In that case a cargo of cheese had been loaded aboard the ship at a Greek port for shipment to the United States via Gibraltar. Two days later, Mussolini attacked Greece and the ship was requisitioned by the Greek Government for a military mission. The ship was then directed by the Greek Government to proceed to the United States via Suez and the Cape of Good Hope. At Aden it was found necessary to discharge the cheese on lighters to effect repairs to the vessel's tailshaft. When the cheese was reloaded it was noticed that it was spoiling and upon subsequent arrival in the United States it had so deteriorated that it brought only one-sixth of its sound value. In an action by the consignee of the cheese against the vessel's owners, the court found that the ship had proved immunity from responsibility under the Carriage of Goods by Sea Act by establishing "restraint of princes to be a cause in the important practical sense that otherwise the stop at Aden and the hot voyage around Africa would not have occurred." 306 F.2d at 432.[30] The consignee, however, argued that detection of spoilage upon reloading the cheese and failure to sell the cheese at that time was a breach by the ship of its duty under section 3(2) of the Carriage of Goods by Sea Act "properly and carefully [to] load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C.A. § 1303(2). The

---

to establish applicability of one of the immunities under the Carriage of Goods by Sea Act.

**30.** Immunity for restraint of princes is provided in section 4(2) (g) of the Act, 46 U.S.C.A. § 1304(2) (g) as follows:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

 * * * * *

(g) Arrest or restraint of princes, rulers, or people, or seizure under legal process; * * *

question thus arose as to whether the ship, having established that the loss occurred as a result of an excepted cause, i. e., restraint of princes, was further required to prove that failure to sell the cheese at Aden was not a cause of the loss—"in other words, [whether] the mere raising of the issue as to the carrier's duty to sell places the burden of persuasion back where the shipper's evidence of delivery in good condition and outturn in bad had put it originally." 306 F.2d at 432. Judge Friendly's answer to that question was as follows:

> Such a contention gives inadequate weight to the division, made in § 4(2) of COGSA, between the specifically excepted causes (a)–(p) and the "catch-all" (q), to wit, "Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." To hold that when a carrier has shown that the loss arose as a consequence of restraint of princes, § 4 (a) (g), it still has the burden of negating any other fault or neglect of its agents or servants would be to read the qualification of (q) into (a)–(p), although Congress did not put it there. It follows that libelant [the consignee] had the burden of showing circumstances from which a trier of the facts could properly conclude that the master's failure to dispose of the cheese at Aden was a breach of § 3(2). * * * [306 F.2d at 432].

The holding 'in *Lekas*—and the underlying reasoning supporting it—leads this Court to hold that if the ship in the present case establishes that a cause of the stranding of the CLYDEWATER was an error in navigation for which it is not liable under section 4(2) (a) of the Carriage of Goods by Sea Act, and that such error was a cause in the sense that other-

wise the stranding would not have occurred, it does not have the burden of negating any other fault or neglect attributable to it or of negating the possibility that the stranding also occurred as a result of another cause. Thus, in this case, if the ship should meet the burden of proving that the accident occurred because of negligent navigation, the mere raising by cargo of the issue of unseaworthiness will not place upon the ship either the burden of negating unseaworthiness as a cause or the alternative burden of proving due diligence to make the ship seaworthy and thus establishing an excepted cause within section 4(1) of the Act. As Judge Friendly indicated in *Lekas*, once a party claiming an immunity under the Act meets the burden of establishing an excepted cause in the sense that otherwise the loss would not have occurred, the burden then shifts to the opposing party to show "circumstances from which a trier of the facts could properly conclude" that the loss was also occasioned by a second, and possibly non-excepted, cause. 306 F.2d at 432. In the present case, if the ship should meet the burden of establishing an error in navigation as an excepted cause, it would then be incumbent upon cargo to prove that unseaworthiness of the vessel was an additional cause of the stranding. If that were done, the ship might then seek to establish that such unseaworthiness was also an excepted cause by shouldering the burden of proving, in accordance with section 4(1) of the Act, due diligence on its part. If however, the ship were unable to do this and the case were submitted to the trier of fact with one cause of the stranding having been proved to be excepted and the other not, the burden would then be upon the ship to show "how much of the damage came from the excepted as distinguished from the unexcepted cause." Lekas & Drivas, Inc. v. Goulandris, supra, 306 F.2d at 432, citing Schnell v. The Vallescura, 293 U. S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934). However, if the ship should prove that it suffered general average damage, and that such damage was caused by an error in navigation, and if cargo should fail to

prove that such damage has any causal connection with unseaworthiness of the ship, then it would be immaterial whether or not the ship was unseaworthy or whether or not due diligence was exercised to make the ship seaworthy since the general average damage complained of would then be held to be due only to an excepted cause under section 4(2) (a). Isbrandtsen Co. v. Federal Ins. Co., 113 F.Supp. 357 (S.D.N.Y.1952).

The principles herein enumerated will govern and control at the trial in this case.