397 F.Supp. 1258 (1973)
In the Matter of GRACE LINE, INC., Plaintiff, as Owner of the STEAMSHIP SANTA LEONOR, For Exoneration From or Limitation of Liability.
No. 68 Civ. 1691.
United States District Court, S. D. New York.
July 27, 1973.
*1259 *1260 Kirlin, Campbell & Keating, New York City (Richard H. Sommer, Laurence J. Bowles, New York City, of counsel), for petitioner.
Bigham, Englar, Jones & Houston, New York City (Douglas A. Jacobsen, Francis M. O'Regan, New York City, of counsel), Donovan, Donovan, Maloof & Walsh, New York City (David L. Maloof, New York City, of counsel), Hill, Rivkins, McGowan & Carey, New York City (Raymond P. Hayden, New York City, of counsel), for respondent.

OPINION
GRIESA, District Judge.
Grace Line Inc., as owner of the Steamship SANTA LEONOR filed on April 25, 1968, a petition for exoneration from or limitation of liability. The petition relates to the stranding and total loss of the SANTA LEONOR on March 31, 1968 in the Patagonian Channels, an inland waterway on the coast of Chile, north of the Straits of Magellan. The SANTA LEONOR was on a voyage from Rio de Janeiro to San Francisco with intermediate calls at various ports. Her last port of call prior to the accident was Buenos Aires, and her next stop was scheduled to be Valparaiso, Chile.
The petition alleges that at the time of the stranding the SANTA LEONOR had on board 50 crew members and 7 passengers, all of whom were rescued. The SANTA LEONOR had a quantity of general cargo on board. The ship and the cargo are a total loss.
Over $2 million in claims for lost cargo have been made against Grace Line. There are also claims by passengers and crew for personal injuries.
The petition alleges that, following the stranding, the value of Grace Line's interest in the SANTA LEONOR was her pending freight and passenger revenue, in the amount of $173,903.
By the time of the trial, commencing June 18, 1973, all but three personal injury claims had been settled. The total of these three claims is less than the available limitation fund. Grace Line has admitted liability as to these three claims. It has been agreed that the trial of damages on these personal injury claims is deferred until a later time.
The trial which has been held has dealt with the issue of liability as to the cargo claims. Grace Line claims complete exoneration, and in the alternative, limitation of its liability to the amount of $173,903 plus interest.
The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq., applies, since most of the SANTA LEONOR's cargo was destined to ports in the United States. Also, all of the bills of lading made COGSA applicable.
In its claim for exoneration Grace Line seeks the benefit of Section 4(2)(a) of the Act, 46 U.S.C. § 1304(2) (a), which provides that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from "Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."
Admittedly Grace Line has the burden of proof of showing it is entitled to this exception from liability. Director General v. S. S. MARU, 459 F.2d 1370, 1372 (2d Cir. 1972). Grace Line asserts it has sustained this burden of proof. Cargo claimants assert the contrary. Cargo claimants contend that the cause of the stranding was either the unseaworthiness of the vessel or was an unknown cause. According to cargo claimants, under either alternative, Grace Line has failed to prove that the accident was caused by an error of navigation.

Error of Navigation
The master of the SANTA LEONOR, Donald F. Johnson, was 59 years of age at the time of the incident. He commenced going to sea in 1926. He received his Coast Guard master's license in 1948 and had actually sailed as a master *1261 of vessels since about 1952. He had sailed through the Patagonian Channels and the Straits of Magellan three times before.
At 9:35 A.M., March 30th, the vessel picked up a Chilean pilot in Possession Bay off Punta Delgada, a port at the east entrance to the Straits of Magellan. The pilot was Ernesto Ruiz Munos (hereafter "Ruiz"). Ruiz was 57 years old. He had been at sea since 1929. He had received his master's license in the Chilean Merchant Marine in 1941 and had received a license as a Chilean channel pilot in 1964. He had made about 180 voyages through the Patagonian Channels as a master of merchant vessels and had made about 50 voyages through the Patagonian Channels as pilot.
A few minutes after the boarding by the pilot, the SANTA LEONOR got under way and proceeded into the Straits of Magellan. During the next 16 hours before the stranding, Captain Johnson and Pilot Ruiz spelled each other in navigating the vessel.
The pilot navigated from the time he boarded at 9:35 A.M. in Possession Bay until 12:30 P.M., when he was relieved by the captain at a point 5 miles below Cape Vincent in the Straits of Magellan. This first section when the pilot was on duty covered narrow, shallow channels called First Narrows and Second Narrows.
The captain navigated the vessel from 12:30 P.M. until 6:00 or 6:30 P.M., when he was relieved by the pilot at a point off Cape Coventry in the Straits. This area navigated by the captain consisted generally of relatively wide and deep channels called Broad Reach, Famine Reach and Froward Reach.
The pilot navigated from 6:00 or 6:30 P.M. until he was relieved by the captain at 9:30 P.M. off Radford Light in the Straits. This area covered by the pilot consisted of narrow channels called English Reach and Crooked Reach.
The captain navigated the vessel from 9:30 P.M. to 12:30 A.M. the next morning (March 31), when he was relieved by the pilot at a point roughly approximating the entrance into the Patagonian Channels. The area which the captain had covered consisted of progressively widening and deep channels.
The pilot navigated the vessel from 12:30 A.M. to the time it ran aground at 1:52 A.M. The grounding occurred on rocks off Isabel Island, approximately 20 miles into the Patagonian Channels, in an area called Paso Shoal. Due to the breaking of the rocks on which the vessel grounded, or for some other reason, the vessel slid back into the channel and floated down a short distance, where it finally came to rest off one of a small group of islands called the Adelaide Islands. A substantial part of the vessel is submerged, and neither the vessel nor the cargo has been able to be salvaged.
During the approximately 16½ hours that Pilot Ruiz was on board the SANTA LEONOR he was navigating the vessel for a total of about 7½ hours, with the captain relieving him for a total of about 9 hours. The testimony of the pilot is that during his off time he was resting and sleeping in his special cabin. According to his testimony he felt well when he was on the bridge at the time of the grounding.[1]
Throughout the passage through the Straits of Magellan and into the Patagonian Channels, to and including the time of the grounding, the vessel was *1262 going full speed, approximately 16-17 knots. Although it had been raining on and off commencing during the late afternoon of March 30, it was not raining at the time of the grounding. Visibility was good. There was a wind from the north-northwest of about 15-25 knots and a current from the north of 1-2 knots.
During the period from 12:30 A.M. to the time of the grounding (1:52 A.M.), Pilot Ruiz was in the wheelhouse in charge of navigation. Also in the wheelhouse were the third mate, Dunham, and the helmsman, D'Acquisto. During this time the master was in the chart room immediately behind the wheelhouse.
As indicated above, the question is whether Grace Line has sustained its burden of proving that the grounding was caused by an "act, neglect, or default" of the ship's personnel "in the navigation or in the management of the ship." There has been extensive evidence, briefing and argument on this issue, and the parties are in vehement disagreement on the conclusion to be reached.
The salient fact is that the vessel sailed off its proper path in the channel between two islands, Richards Island and Isabel Island, and struck the rocks off Isabel Island. This channel, between the outlying rocks of the two islands, has a width of 4/10 of a mile, or 800 yards, or 2400 feet. The channel width is about five times the length of the SANTA LEONOR.
In my view this circumstance of the vessel going off its course and grounding is in itself substantial evidence of navigational error, unless some other less likely cause appears.
Although the cargo claimants do not have the burden of proof on this issue, they have argued that there is evidence of the accident being caused by steering system failure, rather than navigational error. In order to deal with this point, as well as with other questions relating to the cause of the accident, it is necessary to describe the testimony in some detail. A map showing the area of the Patagonian Channels known as Paso Shoal, the area where the grounding occurred, is appended to this opinion.
The evidence shows that the vessel entered Paso Shoal at about 1:40 A.M. The entrance is marked by Point Buckley Light. At this point it was necessary to make a turn to the left of about 90 degrees. The ship then proceeded a short distance, and then made a right turn around Shoal Island of about 90 degrees. After completing this turn the ship proceeded another short distance with Richards Island on the left and the Adelaide Islands on the right. When the ship had Point George Light on Richards Island on its left, it was required to make a left turn of about 110 degrees to carry it through the channel lying between Richards Island on the left and Simpson Island and Isabel Island on the right. These maneuvers were carried out properly until the turn around Point George Light. The grounding occurred because the vessel failed to make the latter left turn properly and went aground on the rocks off Isabel Island.
None of the eyewitnesses testified at the trial. All parties relied upon prior recorded statements and testimony. These statements and testimony were taken (1) before the Chilean maritime investigating authorities in April and May 1968; (2) in a United States Coast Guard investigation during April-June 1968; and (3) in pre-trial depositions taken in this case.
Pilot Ruiz testified to a Commissioner of the Department of Littoral and Merchant Marine of Chile on April 4, 1968. Ruiz stated that shortly before the ship was abeam of Point George Light, he started the left turn with 15 degrees port rudder, and then almost immediately gave a command for hard port rudder because the turn was taking place too slowly. He testified that even after giving hard port rudder, the proper turn was delayed, but then the vessel started *1263 to fall to port slowly. He kept the rudder fully hard to port. But a few seconds later the ship ran aground. Later Ruiz stated:
"I might state that during navigation up to El Paso Shoal the steering conditions were good except at the moment of the final falling off, which was abnormally slow and held up the said falling off a few instants before continuing falling off slowly, not being in accord with the speed of falling-off which the vessel should have had with the rudder hard to port and with the normal cruising speed which her engine was supplying."
The Commissioner suggested possible failure of the steering system and Ruiz agreed.
"COMMISSIONER: To what do you attribute the slowness in falling off to port of the ship? Might it be something wrong in the steering system? "DECLARANT: I attribute it to many reasons, namely the failure in the steering system and a strong current towards the south aided by the wind which was striking it on the port side. The steering system of the vessel is combined hydraulic and electric and the failure might have been in either of the two systems."
Captain Johnson, who had been the first witness in the Chilean proceedings on April 3, reappeared on April 8. He stated that, although he could hear the orders which the pilot gave to the helmsman and the confirmation of the orders which the helmsman called back to the pilot, he "cannot state what they were because I was busy with the charts." He stated that he could not be certain of the rudder degrees but that he had the "impression that the pilot ordered 15 degrees rudder and subsequently ordered more to port, at all times falling off to port." He did not know actually whether the rudder ever reached hard to port. He did not immediately go on the bridge as he would have done if he "had heard an order for hard to port or starboard."
In the meantime, certain vessel personnel were testifying to a Chilean District Attorney. On April 4, 1968 Third Mate Dunham testified. It should be recalled that Dunham was in the wheelhouse at the time of the grounding. He was responsible for assisting the pilot and for, among other things, seeing that the helmsman carried out the pilot's orders.
Dunham's version basically corroborated Ruiz's testimony to the Commissioner of the same date. Dunham testified that shortly before the accident the pilot ordered 15 degrees port rudder, and since the turn was taking place too gradually, the pilot ordered hard port rudder. Dunham stated that at the time of the grounding the rudder angle indicator showed full port rudder.
On April 4, 1968 the helmsman, D'Acquisto, testified before the District Attorney, and sharply contradicted the pilot and the third mate. D'Acquisto was asked what order he had received from the pilot during the last steering maneuver. D'Acquisto answered that the order he received from the pilot was rudder 10 degrees to port. According to this testimony, he kept the rudder 10 degrees to port for two or three minutes and then received the order from the pilot for rudder amidship. He was asked whether at any time immediately prior to the grounding he had received an order from the pilot for full port rudder, and answered that he received no such order. He testified that at the time of the grounding the rudder was in the amidship position. D'Acquisto testified that the pilot's orders were in perfectly understandable English, which D'Acquisto repeated in English. He further testified that the ship appeared to be responding normally to the steering.
To summarize the conflict in the testimony thus far given in the Chilean proceedings  the version of the pilot and the third mate was that the pilot had ordered 15 degrees port rudder, and then *1264 hard port rudder in an attempt to correct too slow a turn. The helmsman's version was that the pilot started with an order of 10 degrees port, followed by an order for rudder amidship, and that at the time of the grounding the rudder was amidship. According to the helmsman, no order for full port rudder was received. The testimony of the master, up to this point, was basically that he had no actual memory of the rudder commands; but he doubted that there was ever a hard port rudder command, since that would have caused him to go to the bridge immediately, which he did not do.
At this point in the Chilean investigation, the District Attorney recalled as a witness Third Mate Dunham to inquire about the above conflicting versions. This testimony was on April 6. The District Attorney asked Dunham whether he heard clearly the order given by the pilot for hard port rudder. Dunham then shifted from testifying about hard port rudder, to describing the command as "more rudder to port."
"Yes, sir. I saw on the helm indicator that the rudder was about 15 degrees port and immediately afterwards he ordered the rudder further to port and then insisted on `More Rudder to Port', `More Rudder to Port'."
As to the position of the rudder angle indicator, Dunham testified that it was "towards port when the collision occurred, but I do not know whether it was hard down to port." Dunham was asked whether he kept the rudder angle indicator under constant observation. Dunham stated that he "did not have my eye fixed on the indicator, but when I did look at it, it was always to port." Finally, the District Attorney asked whether at this time Dunham ever heard the pilot order rudder amidship. Dunham answered that at no time did he hear this order but he did hear the pilot order "more to port, more to port."
Ruiz testified to the District Attorney on April 8, and abandoned his earlier statement about hard port rudder.
"The only thing that I remember is that I insisted in giving orders of More Rudder to Port, but I was unable to verify whether this was fully hard down, this being due to the fact that I was at the starboard wing of the bridge in order to have better visibility, and my orders were re-transmitted by the officer on watch."
He was asked whether he ever gave the order rudder amidship after Point George Light had been cleared. His answer was:
"No, sir, because I ordered at all times and insisted in ordering more rudder to port."
But Ruiz admitted the possibility of the helmsman placing the rudder amidship due to misinterpretation of the orders.
"DISTRICT ATTORNEY: Do you believe that the Helmsman may at any time have placed the rudder amidships due to misinterpretation of your orders?
"DECLARANT: That possibility exists due to the slowness that the vessel had at one time in falling to port, for which reason I insisted in giving more rudder to port on the assumption that it had a minimum of 15 degrees in accordance with the previous order."
Ruiz presented a further modified version of the events in a statement he made April 10, 1968 to the Director of Littoral and Merchant Marine of Chile. He stated in this report that when he was off Point George Light, he ordered 15 degrees port rudder and then 10 degrees rudder:
"When the vessel arrived at about 45 degrees to port of the George Light, on Richards Island, I ordered fall to port with 15 degrees rudder first of all, and then with 10 degrees rudder, in order to clear George Light at a distance of one length to *1265 one and a half cable length. This maneuver was completed correctly and the vessel responded well. I suddenly observed that the falling to port had stopped and I then ordered more port rudder. The vessel again started to fall away but a few seconds later it violently hit bottom on the starboard side."
At some time before April 29, 1968 the Chilean Commissioner of Littoral and Merchant Marine made findings regarding the cause of the accident.[2] The Commissioner found that Pilot Ruiz was responsible for the accident because he failed to reduce speed in the relatively narrow pass with successive pronounced turns. The Commissioner also found that Captain Johnson had a "moral responsibility" because he did not work with the pilot and remained absent from the bridge. Finally, the Commissioner held that Helmsman D'Acquisto deserved a "drastic punishment" for his refusal to reappear, as requested, in order to clarify his testimony.
On April 29, 1968 the Maritime Governor of Punta Arenas forwarded the Commissioner's findings to the Director of Littoral and Merchant Marine, with approval, except that the Maritime Governor recommended that Helmsman D'Acquisto be subjected to further interrogation.
On May 13, 1968 Pilot Ruiz furnished a statement to the Director of Littoral and Merchant Marine, claiming error in the findings of the Commissioner. With regard to the speed, the pilot stated that the speed of 16 knots which was being used was necessary in order to maintain maneuverability.
Perhaps of greater importance for our present purposes is the fact that the statement of May 13 effectively negates the pilot's earlier theory of steering mechanism failure. It will be recalled that when the pilot first testified on April 4, he suggested that one of the causes of the accident may have been a failure in the steering system. In his May 13 statement he made no mention of any claim of steering failure. He stated that his order of more port rudder was made solely to compensate for the fact that the vessel was under the effects of the current and the wind. He concluded as follows:
". . . I believe that from what has been stated above, only one conclusion can be reached, namely that I exhausted all measures within my power to avoid the collision and that if the collision finally occurred, this was due to an act of God, consisting mainly of elements of nature, wind and current, and that if under these circumstances of correct performance of my obligations, the accident nevertheless occurred, there was absolutely no type of responsibility whatsoever on my part."
It is safe to say that if Ruiz had actually believed that there had been failure of the steering system, he would have mentioned it in this May 13 statement.
In May 1968 (the record here does not show the precise date) Captain Johnson also made a statement objecting to the finding of fault against him. As to the charge of "lack of cooperation" with the pilot, Captain Johnson said that he was prepared to assist the pilot at all times, and at the time of the accident, was in the chart room studying the charts for the next stage of navigation. The important part of Captain Johnson's May 1968 statement for our purposes relates to the steering mechanism. Captain Johnson stated that the navigating equipment and the steering mechanism of the SANTA LEONOR operated properly at all times up to and including the accident. He specifically stated that after the accident, the steering system was tested and found to be operating *1266 correctly. He concluded that the accident resulted from an Act of God:
"What explanation can then be given for the accident? It can only be said in some imponderable manner, due to the small forward draft and due to the force of the current and the wind, the "SANTA LEONOR" after having emerged from the lee of Richards Island, shifted to starboard IN A MANNER WHICH WAS ENTIRELY UNFORESEEABLE TO THE PILOT.
"Due to this, his maneuver of 15 degrees port rudder was not sufficient. Now then, this lack of sufficiency was not a lack of expertness on the part of the Pilot, but the imponderable effect of the wind and the current, which due to the unusual change in trim, which the vessel had, made this abnormal displacement towards port UNFORESEEABLE and INSURMOUNTABLE.
"And this constitutes an Act of God or force majeure which cannot be imputed to lack of skill on the part of the Pilot either."
On May 22, 1968 another Commissioner made findings, specifically dealing with the objections of Pilot Ruiz and Captain Johnson to the prior Commissioner's findings. The second Commissioner affirmed the finding of fault against Pilot Ruiz, but found that there was no fault on the part of Captain Johnson or any other officer or crew member of the vessel.
At that point a Maritime Court was designated in Chile to make a final determination as to the responsibility for the grounding. In connection with this proceeding, the Presiding Justice of the Maritime Court held two "confrontations" on May 24, 1968, designed to inquire further into the difference between Helmsman D'Acquisto's testimony and the testimony of Pilot Ruiz and Third Mate Dunham regarding the helm orders. One confrontation was between Ruiz and D'Acquisto. The other confrontation was between Dunham and D'Acquisto. In each confrontation the two witnesses testified together before the Presiding Justice.
At the confrontation between Ruiz and D'Acquisto, D'Acquisto stated that he had received orders from the pilot for 10 degrees port, then helm amidship, then 10 degrees port, then helm amidship, then 10 degrees port, and then helm amidship.
At the confrontation, Pilot Ruiz urged that the testimony of D'Acquisto should be discounted because D'Acquisto "may have been affected by the shock," as indicated by the fact that D'Acquisto reacted to the accident "by suddenly abandoning the bridge before the Master of the vessel ordered it."
D'Acquisto denied abandoning the bridge without prior order from the Master and testified in detail as to the precise actions which were taken by the various persons on the bridge following the grounding, including a check of the steering mechanism which he made under the direction of the captain.
At the second confrontation of May 24  between D'Acquisto and Dunham  Dunham specifically corroborated the fact that D'Acquisto did not abandon the bridge without the captain's order. As to the helm orders before the collision, Dunham stated that he was certain that the first order he heard was "slow to port, and then further to port," but Dunham stated that he could not testify "how many degrees helm were ordered and whether there were other orders; as he was busy with the radar and with the entries, he could not concentrate on the orders which were given."
D'Acquisto, at the confrontation with Dunham, re-affirmed that he had received alternating orders of 10 degrees port and helm amidship, and that the collision occurred with the helm amidship.
On May 24, 1968 the Chilean Maritime Court handed down its decision. The Court held Pilot Ruiz at fault, and exonerated Captain Johnson and the other personnel of the ship.
*1267 Certain additional points of interest appear in testimony during a United States Coast Guard investigation held in San Francisco, California. Captain Johnson testified on June 4, 1968. It is worth noting what Captain Johnson said in his Coast Guard testimony as to his opinion as to the cause of the accident. The opinion given by Johnson at this time differs from the opinion (relied upon by cargo claimants) which he had given to the Chilean authorities to the effect that the accident was caused, not by fault on the part of the pilot, but by an unforeseeable effect of wind and current on the ship, together with an unusual trim which the ship had, which made the vessel slow in falling off to port.
Johnson was asked by the Coast Guard what opinion he formed as to the accident's cause shortly after the occurrence. He stated that after he had had a chance to size the situation up he decided that the pilot "didn't start the turn soon enough on Point George"; the "whole trouble is that he [Ruiz] didn't start the turn soon enough here."
Third Mate Dunham testified before the Coast Guard on June 4, 1968, and Helmsman D'Acquisto testified on June 5. Dunham testified that when the vessel was abeam of Richards Island, the pilot ordered "left easy." The helmsman then gave about 10 degrees left rudder. After the vessel passed Point George the pilot asked for more left rudder. The helmsman gave about 15 degrees left rudder. Then, according to his testimony, Dunham went to the radar, saw the vessel was swinging left, and the vessel struck ground. Dunham maintained that he did not hear a command of rudder amidship.
D'Acquisto again stated in his Coast Guard testimony that the pilot's orders alternated between left 10 degrees and amidship. D'Acquisto stated that all these orders were given directly from the pilot to himself, rather than through the third mate.
Both Dunham and D'Acquisto were asked for their opinions as to the cause of the accident. Both said that in their view the pilot made too wide a turn.
Depositions were taken in this case of Captain Johnson on January 9, 1970 and Pilot Ruiz on March 10, 1971. No depositions were taken of Dunham or D'Acquisto.
Captain Johnson testified in his deposition that he could hear the pilot giving the rudder orders, but he paid no particular attention to them because there was no reason to do so; that, according to his memory, the first command was about 15 degrees left, and that the next command was more left, and beyond that he could not say. He did not know what the rudder angle was at the time of collision. In his deposition Captain Johnson again stated his opinion as to the cause of the accident  that Pilot Ruiz was wide in going around Point George Light, and that Pilot Ruiz did not commence his turn soon enough. He stated that even though the pilot was wide on the light, if he had commenced the turn soon enough, there would have been no difficulty.
Ruiz, in his deposition of March 10, 1971, had difficulty recalling the specific orders given at the time of the accident. He stated that he had given "the usual orders" in his maneuver around Point George Light. He believed that he gave a command of 10 to 15 degrees port, and he remembered no more, except that he denied giving any orders for rudder amidship.
I now return to the question posed earlier  whether Grace Line has proved that the accident was caused by navigational error, rather than some other cause such as failure of the steering mechanism.
I find that steering failure was not a cause of the accident. The only evidence suggesting failure of the steering mechanism came from Pilot Ruiz in his testimony before the Chilean authorities on April 4, 1968. But this testimony was speculative, and I discount it entirely. Ruiz never again referred to possible steering failure. Indeed in his deposition of March 10, 1971 he stated that *1268 the steering mechanism was performing properly. The third mate and the helmsman so testified and I find this to be the fact. Also the evidence proves that the steering system was tested immediately after the grounding and found to be functioning correctly.[3]
It is my conclusion that Grace Line has proved by a preponderance of the evidence that the grounding was caused by navigational error  specifically, improper steering directions given by Pilot Ruiz when rounding Point George Light in the attempt to pass between Richards Island and Isabel Island. The three crucial witnesses on what directions or orders were given were Pilot Ruiz, Third Mate Dunham, and Helmsman D'Acquisto. Captain Johnson was not in the wheelhouse and, although he heard the orders, he has never claimed to have a full recollection of them.
An analysis of the testimony of Ruiz, Dunham and D'Acquisto shows that D'Acquisto is the only one of the three witnesses who has consistently related the same version of the facts regarding what steering directions were given by the pilot.[4] At the confrontation of May 24, 1968 Ruiz attempted to discredit D'Acquisto by stating that D'Acquisto was apparently a victim of shock, as indicated by his sudden departure from the bridge without the master's orders at the time of the grounding. Ruiz's description of D'Acquisto's acts was a fabrication.
D'Acquisto testified consistently on four occasions, that the pilot gave three sets of commands, each of which was for 10 degrees port rudder and then rudder amidship, and that the rudder was amidship at the time of the collision.
The evidence does not indicate that D'Acquisto misunderstood the pilot.
What the evidence does prove, in my view, is that Pilot Ruiz misjudged the turn and gave the wrong commands or directions. His commands produced too wide a turn, causing the vessel to run aground on the rocks on the right side of the channel. I find that Pilot Ruiz never gave a command of hard port rudder or of sufficient rudder to execute the turn properly. Since both Ruiz and Dunham testified so inconsistently on the subject of rudder commands, their testimony is entitled to little or no weight. I should say, however, that even if I believed the version (testified to at times by Ruiz and Dunham) that Ruiz ordered "more port, more port" I would still find such commands indefinite and inadequate for a situation which called for precise directions from the pilot to the helmsman.

The Log and Course Recorder
Cargo claimants have requested that a strong inference be drawn against Grace Line because of the unavailability or disappearance of the deck log book and course recorder.
The evidence from the vessel personnel is that they abandoned the ship an hour or so after the accident without recovering or taking with them the deck log, the course recorder tape or other navigational records which were on the bridge.
Grace Line hired a salvage expert, Martignoni, to go aboard the vessel. *1269 He arrived at the scene on April 7, 1968. However, he had not been instructed to search for navigational records and did not do so. It was subsequent to this that Grace Line's trial counsel, Messrs. Kirlin, Campbell & Keating, were brought into the case. Apparently at their instance search was made for the missing navigational records. This was done by Martignoni and divers in early May 1968.
The course recorder (an instrument designed to make a continuous record of the gyrocompass headings of a vessel) was found by Martignoni's men. However, the portion of the tape covering a period of at least 48 hours surrounding and including the time of the accident had been ripped out. This was clearly the intentional act of someone.
With regard to the deck log and other navigational records, search was made in the wheelhouse and nearby spaces. Parts of these areas were submerged, and divers attempted to locate the records in the water. Some papers were recovered, but nothing of any use. The deck log was not found.
I cannot draw an inference against Grace Line unless I have reasonable grounds to believe that Grace Line was responsible for the disappearance of the records. As to the course recorder tape (and the other records, to the extent they were stolen), there is simply no way to tell whether these items were removed by Grace Line, by cohorts of Pilot Ruiz, or by someone else.
Under these circumstances, I decline to draw any adverse inference against Grace Line from the disappearance of the records.

Speed
Cargo claimants Seed & Feeding Corp. et al. charge that Grace Line had instructed the master of the SANTA LEONOR to proceed at top speed, or at least knew that he would so proceed, and that the speed contributed to the grounding. Cargo claimants Imperial Commodities Corp. et al. charge that the use of full speed in the Patagonian Channels at night was part of a pattern of unsafe practice for which Grace Line is responsible.
It is true, as already described, that the vessel was proceeding at full speed, about 16-17 knots. But the evidence demonstrates that this speed was not excessive. Indeed, the evidence shows that a lesser speed could well have increased, rather than decreased, the danger.
Captain Johnson, in his statement of May 1968 to the Chilean Maritime Court set forth a justification of the use of full speed, which I find convincing and which has no real contradiction in the record in this case. Captain Johnson stated that on the three previous occasions when he had passed through this channel, the pilots had recommended use of full speed due to the fact that vessels like the SANTA LEONOR handle better at full speed. Captain Johnson estimated that, in view of the wind and current, the actual speed over the ground of the SANTA LEONOR was about 14-15 knots. According to Captain Johnson, a slower speed would have actually decreased the ship's ability to maneuver in the wind and current in order to execute the required turn.
Pilot Ruiz testified that his practice was not to slow the speed of vessels going through Paso Shoal, and that a ship turns much easier at 16 knots than at a slower speed such at 10 knots. Two other Chilean pilots testified that in Paso Shoal, in good visibility, they would use speeds of 16 or 18 knots, or even more, if the ship was capable of such speeds.
I find that there was no fault in connection with the speed of the ship.

Claims of Unseaworthiness
Grace Line is entitled to exoneration unless cargo claimants carry the burden of proving that the vessel was unseaworthy and that such unseaworthiness was also a cause of the accident. Director General v. S. S. MARU, 459 F. *1270 2d 1370, 1372 (2d Cir. 1972); Cia. Atlantica v. Humble Oil & Refining Co., 274 F.Supp. 884, 904 (D.Md.1967).
The claims of unseaworthiness are as follows:[5]
1. Pilot Ruiz was unfamiliar with the vessel's characteristics.
2. The vessel should have carried two pilots in these waters.
3. The lookout was incompetent and untrained.
4. The helmsman was incompetent.
5. The steering system was not functioning properly.
6. The trim of the ship, together with the light loading, was improper.
7. The hatch openings on the freeboard deck were not fitted with watertight tarpaulins and dogged down.

1. Claim of Pilot's Unfamiliarity with Vessel

Cargo claimants contend that Pilot Ruiz was unfit because he lacked knowledge of the vessel's characteristics. For this they rely upon the following testimony by Ruiz on April 4, 1968 before the Chilean Commissioner:
"COMMISSIONER: Are you acquainted with the turning radius of this ship and what do you estimate it to be?
"DECLARANT: Not exactly, Mr. Commissioner, because this was the first time I had piloted this type of ship, but it seemed to me that it responded to the rudder normally at open places. As to the estimate, I could not indicate the distance."
Cargo claimants also introduced into evidence the Chilean Piloting Instructions, which state in part:
"On large vessels when detouring around a point with dangers, it is necessary to take into account their diameter of swing and therefore the distance of the new course which is to be followed in order that, once the maneuver has been made, the vessel will be navigating on the route marked on the chart."
At his deposition in 1971 Ruiz was asked whether he agreed with these instructions, which of course he did.
Further than this the point has not been explored. Cargo claimants have done next to nothing to develop or elucidate the point either in the evidence or in argument. They have not taken the trouble to provide a definition of "turning radius" or "diameter of swing." They have not shown how in fact Ruiz's lack of knowledge of "the turning radius" contributed to the accident. No question along this line was asked of him at his deposition.
Knight's Modern Seamanship (13th ed. 1960) has a discussion of turning characteristics of vessels, including definitions of "turning circle," "tactical diameter," and "final diameter" (pp. 193-95). "Turning circle" is defined as the path followed by the bow of the ship in making a turn of 360 degrees or more. "Tactical diameter" is defined as the distance gained to the right or left of the original course when a turn of 180 degrees has been completed. "Final diameter" is defined as the distance between the point where a 180 degree turn is completed and the point where a full 360 degree turn is completed.
There are obviously different circles and different diameters depending on the speed of the ship and the rudder angles used.
I would assume that a "turning radius" refers to half of the diameter of a 180 or 360 degree turn taken at a particular speed and rudder angle.
*1271 Knight also states that the above type of turning data is calculated without taking into account wind and current (p. 193). But Knight goes on to say that "as every seaman knows," wind affects turning in that the freeboard and superstructure act as a "sail area" whose effect must be considered by the navigator. Also, current affects the underwater body of the ship, and must be considered (pp. 195-96). There are several additional factors which come into play in a sharp bend in a narrow channel  "bank suction," "bank cushion," the strength of channel currents in the bend, eddies and counter currents (p. 199).
The text states that a thorough knowledge of the maneuvering characteristics of a ship is necessary when handling her in restricted waters (p. 197). But the navigator must also reckon with the natural forces, such as wind, current, etc. (pp. 196-99).
The evidence is that Pilot Ruiz had ample experience in these waters with a variety of vessels, including those of the size of the SANTA LEONOR. When he came aboard the SANTA LEONOR, Captain Johnson knew him by reputation as a very good pilot, and this was confirmed by Johnson's personal observation of Ruiz during his navigation of the First and Second Narrows near the entrance to the Magellan Straits. Prior to the accident, Ruiz had navigated the vessel for a total of 7½ hours, including a variety of turning maneuvers executed properly.
The mere fact that Ruiz did not have in mind the precise figures for turning radius does not indicate to me that he lacked knowledge of the handling characteristics of the ship so as to make him incompetent as a pilot. Further, I cannot find, on the basis of the proof, that any unawareness of the turning radius was a causative factor in the accident. There is absolutely no testimony, by Ruiz or anybody else, to the effect that a reason the vessel ran aground was due to a misconception of the turning radius, as distinct from numerous other possible causes of misjudgment.
I find that, although Ruiz made an error in his handling of the ship at the time of the accident, cargo claimants have failed to prove that Ruiz was basically incompetent for the voyage. In any event, there was no lack of diligence on the part of Grace Line in accepting this experienced pilot on the SANTA LEONOR.

2. Two-Pilot Contention

The most serious and difficult contention of unseaworthiness by the cargo claimants is that Grace Line should have taken two pilots, instead of one, when it entered the Straits of Magellan. The argument is that two pilots were necessary to spell each other, and to work together in difficult passages, during the course of the 634 mile, 35 hour, voyage through the Straits of Magellan and the Patagonian Channels.
Cargo claimants argue that the failure to have a second pilot was a causal factor in the grounding of the SANTA LEONOR in two respects  (1) in causing Pilot Ruiz to be fatigued at the time he was in charge of the vessel in Paso Shoal; and (2) in depriving Ruiz of expert assistance from a second pilot which would have prevented his navigational mistake.
Thus the contention of cargo claimants regarding the necessity for two pilots has two quite different aspects. One aspect relates to the possible fatigue of the pilot which would result from his being on the bridge in charge of navigation for too extended a period in long passages without being relieved by another pilot or some other competent navigating officer.
The second aspect of the problem has nothing essentially to do with the length of the passage or the need of pilots to relieve each other. It has to do with the fact that certain areas may be so difficult to navigate that two pilots must work together as a team.
*1272 I reject at the outset the contention of cargo claimants that the failure to have two pilots was a violation of a United States statute. 46 U.S.C. § 223 provides that every ocean vessel of 1,000 gross tons and over shall have "on board three licensed mates, who shall stand in three watches while such vessel is being navigated."
Cargo claimants somehow construe this as requiring the SANTA LEONOR to have two Chilean pilots in the Straits of Magellan and the Patagonian Channels. They argue in the alternative that if the statute does not directly apply, it is evidence of the proper standard of piloting requirements.
I do not construe the statute as directly applying or as constituting evidence of what foreign pilots should be provided in foreign waters. The statute is specifically and clearly directed to the requirement as to regular licensed officers and the watches to be taken by such officers. The SANTA LEONOR's complement of licensed officers and the watches which such officers stood fully complied with the statute.
In my view, 46 U.S.C. § 223 simply does not bear upon the question of whether the SANTA LEONOR should have had on board two Chilean pilots at the time of the incident in question. The anomaly of cargo claimants' argument is that if the statute were to apply, the logical conclusion would be that not two, but three, pilots would be required. Thus reliance on the statute proves too much.
Cargo claimants rely on The Denali, 105 F.2d 413 (9th Cir. 1939). That case is not applicable. Alaska Steamship Company, in its sailing between Seattle and Alaskan ports, employed a two-watch system under which the master and the second mate served together as a team for six hours, followed by the pilot (used as a mate) and the third mate serving together for six hours. There was no three-watch system for the mates as required by the statute. In my view, the case does not deal with the problem of what foreign pilotage should be superimposed over a proper three-watch system involving the regular mates of a ship.
As to the Chilean regulations, it is conceded that at the time of the accident such regulations required only one pilot. The regulations were amended shortly after the SANTA LEONOR accident to require two pilots. I will deal shortly with cargo claimants' argument based on this amendment.
A Grace Line captain of long experience  Captain Sommers  testified at the trial that he had made a total of about 50 voyages through the Straits of Magellan and the Patagonian Channels  35 of these as master of vessels. He testified that prior to the change in the Chilean regulations in 1968, he consistently used one pilot only. Prior to becoming a ship master himself, he had worked under several other masters who similarly took one pilot only in these waters. Indeed cargo claimants concede that it was the practice for vessels of the SANTA LEONOR's speed to use only one pilot.
At the time of the accident it was an established practice on Grace Line vessels to have the master and the single pilot spell each other in the Straits of Magellan and the Patagonian Channels so that the pilot could have periods of rest. Captain Sommers testified to the specific times and places where he and his pilots spelled each other in the Straits of Magellan and the Patagonian Channels. The system Sommers used differed only in minor detail from the arrangement, described earlier in this opinion, by which Captain Johnson and Pilot Ruiz relieved each other during the voyage in question.
Captain Sommers, like Captain Johnson, took the navigation in the easier sections of the Straits of Magellan, having the pilot take over during the more difficult areas. Captain Sommers, like Captain Johnson, had the pilot take over at the entrance of the Patagonian Channels, with the pilot retaining control through Paso Shoal. The vessels on which Captain Sommers had sailed *1273 usually passed through Paso Shoal at night.
Captain Sommers testified that in his opinion it is safe to navigate the Straits of Magellan and Patagonian Channels with one pilot, provided the master and the pilot relieve each other as was done with the Grace Line vessels.
Grace Line also called as a witness Captain Dolber of the United States Coast Guard, who was commanding officer of the icebreaker SOUTHWIND, which sailed south through the Patagonian Channels in late 1967 on its way to Antarctica, and was sailing north through the Patagonian Channels on the night of the grounding of the SANTA LEONOR.[6]
Captain Dolber testified that he had only one Chilean pilot on each passage through the Patagonian Channels, and never considered asking for more. In Captain Dolber's opinion navigation with one pilot in the Patagonian Channels was a safe practice.
Cargo claimants called as an expert witness on this subject Captain Patterson, a retired United States Lines master of long experience. He testified to 16 locations throughout the world where two or more pilots are required.
On the first aspect of the pilotage problem referred to above, Captain Patterson's testimony furnished abundant proof of what should really be obvious  i. e., that in different parts of the world there are various systems for having one pilot take over from another pilot on long passages.
On the second aspect of the problem  the question of two pilots working together in difficult passages  Captain Patterson could cite only two places where he knew of two pilots being required to navigate as a team. These are the Manchester Ship Canal in England, having a width of only about 120 feet; and the Panama Canal, where two pilots work together on very large ships, with one pilot being in charge of navigation and the other pilot actually taking the helm.
Captain Patterson voiced the opinion that for the voyage through the Magellan Straits and Patagonian Channels two pilots are necessary both to spell each other and to enable both pilots to be on the bridge together in difficult areas, including Paso Shoal. But Captain Patterson has never sailed in the Patagonian Channels (including Paso Shoal), and has sailed in the Magellan Straits only once, as a quartermaster in 1924.
Cargo claimants also called Professor McFarland of the Harvard School of Public Health, who is an expert regarding stresses experienced by transportation employees such as aircraft pilots and truck drivers. Although Professor McFarland's expertise in his field is great, his testimony did not sufficiently relate to the facts of this case to be helpful.
The evidence described thus far is not of sufficient weight to carry cargo claimants' burden of proof that it was unseaworthy for the SANTA LEONOR to sail in the Chilean waters without two pilots.
To summarize  Grace Line's evidence is that there are passages in the Chilean waters where a competent master of a vessel can safely navigate and relieve the Chilean pilot. Cargo claimants' expert witnesses did not effectively refute this evidence. Grace Line's evidence is that the arrangement for Captain Johnson and Pilot Ruiz to spell each other was such as to permit sufficient rest to *1274 the pilot. Cargo claimants' experts have not proved to the contrary.
Cargo claimants' witnesses have also failed to demonstrate that there should have been two Chilean pilots on the bridge at the same time in Paso Shoal. As already noted, Captain Patterson has no actual knowledge of these waters. Nor did he refer to any convincing analogies from other areas of the world.
But cargo claimants also seek to support their position on the basis of the change in the Chilean regulations in June 1968 to require two pilots.
It appears that a controversy about the number of pilots to be employed in the waters in question had been going on for some years prior to 1968. A deposition witness in this case, Pilot Rojas, claims to be the one who suggested a two-pilot rule. His testimony is that about one-half the pilots favored the rule and one-half did not. Rojas asked that the Department of Littoral and Merchant Marine make a study, which was done. The study commenced in 1965 or 1966. The views of the various pilots were solicited on the question of whether two pilots should be required on vessels with a normal speed of 10 knots or less. Cargo claimants have introduced in this action the comments of several of the pilots, written in 1967, which unanimously favored the requirement of two pilots on these slow vessels. Such vessels required over 60 hours to make the 634-mile passage, and their personnel and equipment were sometimes sub-standard. The pilots complained that on such vessels they were required to navigate for exorbitant periods of time  18 hours or more  with totally inadequate assistance and relief from the masters.
On the other hand, it is noteworthy that Pilot Rojas in a statement dated May 2, 1967 asserted that if a single pilot could be relieved in the easier portions of the channels so that he could have sufficient sleep, then there would be no necessity of employing two pilots. Pilot Rojas set forth a precise schedule recommending the areas for relief of the pilot. This schedule corresponds closely to the schedule used by Grace Line in general (and Captain Johnson in particular) for having the master relieve the Chilean pilot in the Straits of Magellan and Patagonian Channels.
On August 24, 1967 the Director of Littoral and Merchant Marine issued a directive that, commencing on September 1, 1967, vessels developing a normal speed of 10 knots or less would be required to use two pilots in the Straits of Magellan and Patagonian Channels. The sole reason given was the need to have relief for the pilots during the long passage. Nothing was said about any need to have two pilots on duty together in difficult areas. A copy of the new regulation was furnished to Grace Line's Chilean agents.
On November 24, 1967 the Director of Littoral and Merchant Marine submitted to the Commander in Chief of the Chilean Navy a draft of a proposed "Supreme Decree" amending the piloting regulations to provide for two pilots on all vessels in the Straits of Magellan and Patagonian Channels. However, the sole explanation for the proposed amendment was still the need for pilots to be relieved during the 634-mile passage. On December 18, 1967 the Commander in Chief of the Navy forwarded the proposed amendment to the Ministry of National Defense with approval.
The amendment requiring two pilots on all vessels was not enacted prior to the SANTA LEONOR grounding of March 31, 1968. As of that date the Chilean regulations required two pilots on vessels of 10 knots or less, and required only one pilot on faster vessels such as the SANTA LEONOR.
The decision in the SANTA LEONOR matter by the Chilean Maritime Court (at least a majority of whose members were professional pilots) included a recommendation for the carrying of two pilots in the Magellan Straits and the Patagonian Channels on all vessels. The recommendation referred to two purposes *1275  to provide relief for the pilot and to enable both pilots to be on the bridge in difficult areas.
On June 6, 1968 a Supreme Decree was promulgated amending the Chilean pilot regulations to provide for two pilots on all vessels in the Magellan Straits and the Patagonian Channels. The new rule took effect on July 1, 1968. The Director of Littoral and Merchant Marine issued an explanation of the new rule, describing the need for relief and rest for pilots and also stating that both pilots should be on the bridge at the same time in "the difficult passages, such as for instance, the crossing of the Inglesa Narrows, Gray or Mayne Channel, etc." Paso Shoal was not specifically mentioned, although, of course, it was not excluded.
Cargo claimants contend that the new regulation of June 1968 is evidence that the use of only one pilot was, even before the regulation's enactment, an unsafe practice. They further argue that the agitation by the Chilean pilots for a two-pilot rule should have persuaded Grace Line to adopt this measure.
I hold that cargo claimants have not sustained their burden of proving that Grace Line was required, as a matter of prudence, to carry two pilots prior to any specific mandate under Chilean regulations.
I have already stated my view that the expert testimony at the trial does not support cargo claimants' contention. In my opinion, the evidence about the change of the law in Chile and the background thereof equally fails to support a holding that the SANTA LEONOR was unseaworthy for failure to carry two pilots.
The principal thrust of the Chilean pilot agitation was directed at the problem of overwork imposed upon a single pilot attempting to navigate the 634-mile passage. I believe that Grace Line was reasonable in concluding that its system of having the master relieve the pilot sufficiently met this problem.
As far as the other aspect of the problem is concerned  the contention that two pilots should have been working together as a team in Paso Shoal  it is not at all clear that even now there is such a requirement. Cargo claimants rely heavily on the testimony of Pilot Cortes, who was the Chief of the Chilean pilots during 1967-70. But, when Cortes was asked in a deposition whether he favored the use of two pilots in Paso Shoal, he gave an answer which was basically negative:
"Professionally, no. It may be a help in the case of foreign ships. In the case of foreign ships it is a help only, you could say, just to have a glance at the helmsman and to see if he is complying with the orders the pilot is giving because in a narrow space there can't be two persons in charge at the same time. Only one can give orders, that is the pilot at the moment. One pilot. Even where there are two pilots, one is in charge."[7]
As to the general requirement, now in effect, for two pilots in the Magellan Straits and Patagonian Channels, he stated:
"Yes. I want to explain. Professionally you need only one, but the regulations require two." (emphasis added)
Cortes testified in 1971 that since the time of the June 1968 regulation he had himself sailed with a second pilot only once, and that on all his other voyages he had obtained exemption from the two-pilot requirement from the Chilean authorities.
Cargo claimants rely on the testimony of Pilot Rojas as favoring the use of two pilots together in Paso Shoal. But when asked about the difficulty with Paso Shoal he said that it related to the *1276 possibility of a ship coming from the opposite direction. When asked whether the physical characteristics of the pass in themselves make it difficult, he answered flatly that they do not. He said that "with a good helmsman there is no problem whatsoever."
I am not, of course, suggesting that Grace Line should not comply with the current Chilean regulations requiring two pilots. But I see no satisfactory basis for holding that Grace Line should have carried two pilots before the new regulations went into effect. There is no showing that Grace Line, in connection with the voyage of the SANTA LEONOR or otherwise, imposed overlong periods of duty upon pilots in the Chilean waters. The evidence is that Pilot Ruiz had adequate periods of rest and was sufficiently rested at the time of the accident, and I so find.
There is also no sufficient showing that Pilot Ruiz should have had another Chilean pilot working with him in Paso Shoal. Chilean regulations did not require this at the time and do not specifically require it now. The weight of the expert opinion is against the idea that such a practice is necessary.

3. Claim of Incompetent Lookout

Cargo claimants assert that the vessel was unseaworthy because, at the time of the accident, the lookout on duty  an ordinary seaman named Wittenberg  was untrained and incompetent.
Wittenberg had been going to sea for about a year and a half. He had apparently acted as lookout on two other vessels. He had been told by "guys" on the other ships and on the SANTA LEONOR about standing lookout. But he had never been instructed by the officers of the SANTA LEONOR.
There is not the slightest indication that Wittenberg failed to report anything he was supposed to report, or that the accident of the SANTA LEONOR had the remotest connection with any reports or lack of reports by Wittenberg.
Cargo claimants assert that Wittenberg did not know how to report objects by points. How this was connected with the accident is not explained. In any event, his testimony is that he understood that a point of the compass equals 11 or 13 degrees. In fact, a point equals 11 degrees 15 minutes, so that Wittenberg's knowledge on this matter should have been sufficient for the purpose. In any event, the blame for the accident cannot be laid to Wittenberg.

4. Claim of Incompetent Helmsman

There is simply no evidence in support of the claim that the helmsman was incompetent. The evidence is entirely the other way. The matter merits no further discussion.

5. Claim of Defective Steering System

This matter has been sufficiently covered in the early part of the opinion dealing with the question of navigational error, where I found that the steering system was in proper working order.

6. Claim Relating to Trim and Light Load

Certain cargo claimants urge that the vessel had an unusual trim, which contributed to the grounding. The vessel had a draft of 16 feet forward and 23 feet 6 inches aft. She was "light" in that she was loaded to only about 1/3 of her cargo capacity. In his May 1968 statement to the Maritime Court, Captain Johnson alluded to what he called "the unusual change in trim." But this subject was never pursued with Captain Johnson or with any other witness to the extent of indicating that there was anything abnormal or faulty about the degree of trim to the ship. Knight states what is probably obvious  that "in most ships there is more superstructure forward than aft" (p. 196). In any event, no analysis has been developed which comes close to proving that the lightness or trim of the ship constituted an unseaworthy condition.
Pilot Ruiz testified in his deposition of March 10, 1971 that neither the lightness of the ship nor the condition of trim created difficulty in maneuvering. *1277 Captain Johnson in his deposition of January 1, 1970 testified that when the ship sailed from Buenos Aires it was in a good, stable condition.
I find that cargo claimants have not made a case of unseaworthiness with respect to the trim or the load of the ship.

7. Claim Regarding Hatch Covers on Freeboard Deck

Cargo claimants allege that the vessel was unseaworthy in that the hatch covers on the weather or freeboard deck were not fitted with watertight tarpaulins and dogged down. The claim is that this condition somehow increased the flooding and contributed to the loss of the vessel.
The evidence shows that the weather deck hatch covers were not watertight. But I find that this situation could not have been a causal factor in the loss of the vessel and its cargo.
Shortly after the time the SANTA LEONOR ran aground and then slid back off the rock, she heeled radically to starboard and commenced going down by the head. The ship appeared to be sinking, and was abandoned. In the process of sinking she drifted onto some other rocks off the Adelaide Islands where she came to rest largely, but not completely, submerged.
The evidence shows that the gash on the bottom of the ship, caused by running over the first rock, ran from the stem of the ship back under the starboard side, underneath the forward cargo holdsNos. 1, 2, and 3.[8] The vessel was constructed so that it would not sink if only one cargo hold were flooded. But the vessel would sink if two or more cargo holds were flooded.
One might assume that the gash in the bottom of the ship underneath holds Nos. 1, 2, and 3 ruptured those holds and caused them to be flooded. The matter is not quite that simple, however. There are shallow spaces called "double bottoms" between the underneath plating of the ship and the cargo holds. The plating between the double bottoms and the cargo holds is called the "tank tops." It is possible for the outside plating to be pierced without puncturing the tank tops and flooding the holds.
Cargo claimants contend that the flooding of the forward holds, which caused the ship to submorge, came substantially from above  through the hatch covers which they claim were not watertight. Although the evidence is somewhat in doubt as to the precise extent and timing of the ruptures in the underside of the cargo holds, it is vastly more probable that the flooding came from that direction rather than from the hatch covers on top. Although the actual plating on the underside of the cargo holds was difficult for the divers to view, there is clear evidence that such plating was punctured in at least holds Nos. 1 and 3. In any event, it would be outlandish to conclude, in view of the long gash down the underside of the ship, that the flooding which caused the vessel to submerge came from the hatch covers above.

Conclusion
After all the various contentions and countercontentions have been examined, the fact stands out that this accident was caused by a momentary error of Pilot Ruiz in handling a turn in the Patagonian Channels of Chile. This is exactly the kind of situation in which Congress intended to exempt the shipowner from liability. In order to avoid this exemption, cargo claimants have struggled to prove numerous elements of alleged unseaworthiness. Such claims are not borne out by the proof.
The petition of Grace Line for exoneration from liability is granted.
Settle order.

*1278 APPENDIX

NOTES
[1] In his deposition of March 10, 1971, Pilot Ruiz first stated that he had rested for only about four hours while on board the SANTA LEONOR prior to the grounding. Later in his deposition Ruiz claimed that he slept four hours and rested another two or three. He also stated that he took over the navigation at 11:30 P.M., whereas the other witnesses testified that it was 12:30 A.M. To the extent that Ruiz's testimony conflicts with the master's chronology, which is substantially corroborated by the second and third mates, I accept the testimony of the latter three witnesses.
[2] I am not relying upon the findings or conclusions of the Chilean authorities in connection with my decision. It is necessary, however, to refer to such findings and conclusions in order to put certain testimony in proper context.
[3] Cargo claimants interpret certain testimony of the master and third mate as indicating that there could not have been a steering test after the grounding, because of an immediate power loss. I do not agree with this reading of the testimony and find that the power operating the steering system remained in operation long enough to carry out the steering test which was in fact specifically testified to by the master, the third mate and the helmsman. Cargo claimants also rely on testimony by the chief engineer to the effect that he received a report from the bridge that the steering was not working. But this was at 2:10 A.M.  20 minutes after the grounding. The testimony of the chief engineer does not prove trouble in the steering system prior to the grounding, nor does it rebut the testimony about the positive results of a steering test conducted immediately after the grounding.
[4] At the oral argument I indicated that I might disregard the testimony of D'Acquisto on the helm commands in favor of testimony of Ruiz, Dunham, and Johnson. This was before I had fully studied the record.
[5] The unseaworthiness claims of cargo claimants Imperial Commodities Corp. et al. are limited to those submitted in their post-trial brief filed June 25, 1973 and supplemental post-trial brief filed July 9, 1973. The unseaworthiness claims of cargo claimants Seed & Feeding Corp. et al. are limited to those set forth in their proposed conclusions of law filed April 10, 1973. Cargo claimants Tupman Thurlow Co. et al. have not suggested any additional claims of unseaworthiness.
[6] The SOUTHWIND was apparently a few hours ahead of the SANTA LEONOR in the Channels. After the grounding, the SOUTHWIND received the SANTA LEONOR's call for assistance, and the SOUTHWIND turned around to go to the SANTA LEONOR's aid. As it turned out, no aid from the SOUTHWIND was necessary, and the SOUTHWIND did not actually go to the scene of the accident. Captain Dolber was called in this case solely as an expert witness, not as an eyewitness to any of the events of the accident.
[7] This and other testimony indicates that, where two pilots are on the bridge at the same time, one of the main functions of the second pilot is to make sure that the helmsman obeys the first pilot's orders. I find that in the present case there was no difficulty in the helmsman understanding and carrying out Pilot Ruiz's orders.
[8] Nos. 1, 2, and 3 holds were forward of the deckhouse and engine spaces. Nos. 4 and 5 holds were aft of the deckhouse and engine spaces. The ship is now pointing down into the water and Nos. 1, 2, and 3 holds are all or mostly submerged. Nos. 4 and 5 holds are mostly out of the water.